# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MERION CAPITAL L.P. and MERION CAPITAL II L.P., | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | C.A. No. 9320-VCL |
| LENDER PROCESSING SERVICES, INC., | ) ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 21, 2016
Date Decided: December 16, 2016

Steven T. Margolin, GREENBERG TRAURIG, LLP, Wilmington, Delaware; Stephen E. Jenkins, Richard D. Heins, Marie M. Degnan, Peter H. Kyle, ASHBY & GEDDES, Wilmington, Delaware; *Counsel for Petitioners.*

Bradley R. Aronstam, S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; John A. Neuwirth, Evert J. Christensen, Jr., Matthew S. Connors, Elizabeth Kerwin-Miller, WEIL, GOTSHAL & MANGES LLP, New York, New York; *Counsel for Respondent.*

**LASTER, Vice Chancellor.**

Petitioners Merion Capital L.P. and Merion Capital II L.P. (together, "Merion") brought this statutory appraisal proceeding to determine the fair value of their shares of stock in Lender Processing Services, Inc. ("LPS" or the "Company"). The valuation date is January 2, 2014, when Fidelity National Financial, Inc. ("Fidelity" or "FNF") completed the merger by which it acquired the Company (the "Merger"). This post-trial decision determines that the fair value of the Company's common stock at the effective time of the Merger is $37.14.

## I.      FACTUAL BACKGROUND

Trial took place over four days. The parties submitted 357 exhibits and lodged eight depositions. Four fact witnesses and two experts testified live. The following facts were proven by a preponderance of the evidence.

### A.      The Company

At the time of the Merger, the Company provided integrated technology products, data, and services to the mortgage lending industry, and it had a market leading position in mortgage processing in the United States. Its business operated through two principal divisions: Transaction Services ("Services" or "TS") and Technology, Data & Analytics division ("Analytics" or "TD&A").

The primary segment within the Services division focused on loan originations. It supported lenders by facilitating many of the steps necessary to originate a loan. Most of the originations, however, were not new loans, but refinancings of existing loans. The Services division also had a segment that supported lenders, servicers, and investors by facilitating many of the steps necessary to foreclose on a property.

1

The Analytics division focused on providing ongoing support to lenders and loan servicers. Its "MSP platform" automated many of the loan servicing functions performed during the life of a loan. A smaller business segment specialized in troubled loans.

**B.      The Company's Origins**

The Company started as the financial and mortgage services division of Alltel Information Services. PTO ¶ 11. In 2003, Alltel sold that division to Fidelity, which is a leading provider of (i) title insurance, escrow, and other title-related services, and (ii) technology and transactional services for the real estate and mortgage industries. *Id.* ¶¶ 6, 11. Thomas H. Lee Partners ("THL") is a private equity firm that worked with Fidelity on the acquisition but did not co-invest at the time of the deal.

Fidelity reorganized the former Alltel division as part of a subsidiary called FNF National Information Services, Inc. ("FNF Services"). PTO ¶ 11. In 2005, THL invested in FNF Services. In 2006, Fidelity spun off FNF Services. *Id.*

In 2008, FNF Services spun off the Company. Its shares traded on the New York Stock Exchange until the Merger closed. *Id.* Because of the Company's historic ties to Fidelity, the Company continued to share an office campus with its former parent (although occupying separate buildings). The two companies also shared private jets, hangar facilities, and server space.

**C.      The Effect Of The Great Recession On The Company's Business**

The Company's spinoff coincided with the Great Recession of 2008. Although devastating to many households, the financial crisis was a boon to the Company, because

loan defaults drove key segments of its business. Revenue grew by approximately 80% from pre-recession levels to peak in 2010. JX 111 at 21.

But the Company also was involved in some of the problematic loan protocols that led to the Great Recession, colloquially known as "robo-signing." In 2010, the United States Department of Justice, the Federal Bureau of Investigation, and attorneys general from all fifty states commenced civil and criminal investigations into the Company's practices. Stockholders also filed lawsuits. PTO ¶ 12.

## D. Fidelity's Early Overtures

In April 2010, amidst the negative publicity from the robo-signing allegations, Fidelity, THL, and the Blackstone Group made an unsolicited offer to buy the Company. The Company's board of directors (the "Board") retained the Goldman Sachs Group, Inc. ("Goldman") as its financial advisor. The discussions did not go far. PTO ¶ 13.

In early 2011, THL and Blackstone approached the Company again. Goldman continued in its advisory role. Again, no deal was reached. PTO ¶ 14.

In late 2011, the Company's CEO retired due to medical issues. In October, the Board hired Hugh Harris to serve as President and CEO. He also became a director.

Harris had ties to Fidelity. In 2003, he worked for Fidelity and THL as a consultant on the Alltel deal. Afterwards, Fidelity hired Harris to run one of the new business units. Harris continued to work for FNF Services after its spinoff. He retired in 2007, before the Company's spinoff in 2008.

Harris also had ties to THL. In addition to consulting on the Alltel deal, he worked with THL for several years in the mid-1990s. Tr. 9 (Harris). He also was a friend of and

3

owned hunting land with one of THL's principals. Tr. 12 (Harris). Given these relationships, the Board excluded Harris from its deliberations about any potential transaction with THL and Fidelity, and Harris recused himself from voting as a director. The Board determined that Harris could, however, "do all the normal things that the CEO would do as far as presenting the company, the business, what was going on with the company, our projections, our results, et cetera." Tr. 25 (Harris); *see* PTO ¶ 7.

In late November 2011, THL reached out to Harris. He referred the call to Lee Kennedy, the Company's Chairman. This time, the discussions progressed further. In December, the Company and THL signed a confidentiality agreement. In February 2012, after conducting due diligence, THL offered to buy the Company for $26.50 per share. THL's offer noted that Blackstone and Fidelity would participate in the deal, and THL later explained that Fidelity would contribute its ServiceLink business to the surviving entity. The ServiceLink business competed with LPS and was a source of synergies.

On February 28, 2012, the Board met to discuss the offer. Goldman continued in its advisory role. The Board determined that a transaction was potentially attractive, but not at that price. PTO ¶ 19. The Board decided to explore whether someone might pay more by reaching out to other financial sponsors and strategic buyers. Tr. 27 (Harris).

In March 2012, Goldman reviewed the Company's financial performance with the Board. After analyzing several market-based metrics, Goldman opined that "the Company was fully valued at current trading prices." JX 33 at 2. Goldman's illustrative discounted cash flow analysis, which used LPS's historical discount rate and assumed a 1% perpetuity

4

growth rate, produced a valuation of $25.91 per share. *Id.* at 17. The Company's stock closed at $24.66 that day. *Id.* at 13.

In April 2012, after additional due diligence, THL, Blackstone, and Fidelity increased their offer to $28.00 per share, comprising $26.00 in cash and $2.00 in Fidelity stock. The Board rejected that price as inadequate. PTO ¶¶ 22-23.

In May 2012, THL, Blackstone, and Fidelity increased their offer to $29 per share, payable entirely in cash or in a combination of $27.00 in cash and $2.00 in Fidelity stock. JX 38 at 2. The bidding group explained that the premium depended in part on anticipated synergies with the ServiceLink business. JX 260 at 53.

By this point, with the country emerging from the Great Recession, management was concerned that the Company's performance would deteriorate. During a series of meetings in May 2012, management provided the Board with updated financial forecasts that contemplated revenue declining approximately 25% by 2017. JX 44 at 927. The forecasts projected that EBITDA would decrease by 7.2% through 2017 before increasing by 7.5% through 2022. *Id.* Despite the weaker forecasts, the Board told THL that the proposed consideration "was inadequate and should be raised to a price in the $30s." JX 44 at 3.

During the last week of May 2012, Goldman contacted three financial sponsors: Texas Pacific Group Capital ("TPG"), Kohlberg Kravis Roberts & Co. L.P. ("KKR"), and Advent International. Goldman also contacted seven potential strategic buyers: Accenture, Berkshire Hathaway, IBM, Infosys, Oracle, Tata Consultancy Services, and Total Systems Services. Several of the parties entered into confidentiality agreements, conducted due

diligence, and received management presentations. None made an offer. Five of the strategic buyers had no interest. Two said they needed more time to evaluate the opportunity. KKR and Advent said they could not pay a premium and meet their internal hurdle rates. TPG was only interested if it could be part of the THL/Blackstone/Fidelity consortium.

On June 8, 2012, THL told the Company that the consortium would not offer more than $29.00 per share. PTO ¶ 25. The directors felt that was a good price but remained committed to $30.00 per share. They rejected THL's offer, but decided to negotiate the terms of the transaction documents in case the consortium changed its collective mind.

In June 2012, two strategic bidders—Total Systems Services and Infosys— expressed interest in buying the Company, only to promptly change their minds. Total Systems wanted to team up with a financial sponsor but said it could not find one. Infosys cited LPS's size, lack of strategic fit, and legacy issues.

The Board and the consortium negotiated a draft merger agreement that included a go-shop, but neither would budge on price. One critical issue dividing the parties was the extent of the Company's legal risk due to the pending investigations and lawsuits. In August 2012, discussions terminated. PTO ¶ 27.

### E. The Board Hires BCG.

In October 2012, the Board hired the Boston Consulting Group ("BCG") to evaluate the Company's core businesses, research market trends, assess the legal and regulatory environment, and test the reliability of management's projections. The Board also asked BCG to evaluate the Company's strategic alternatives with a focus on two particular

6

opportunities: (i) continuing to operate the Company in its existing configuration, or (ii) splitting up the Company's two businesses.

BCG would spend the next six months conducting an in-depth review of the Company's business that included over 120 interviews with LPS employees, customers, and investors. Based on its work, BCG generated a report that spanned more than 200 pages. *See* JX 111. Through this process, BCG "pressure tested" each element of the Company's five-year projections based on macroeconomic factors, industry trends, and the Company's specific product lines. *See* Tr. 226 (Schilling); Tr. 19 (Harris).

**F.     The Company Addresses Its Legal Problems.**

On January 31, 2013, the Company announced that it had entered into a settlement agreement with the attorneys general from forty-six states and the District of Columbia. PTO ¶ 31. As part of the settlement, the Company agreed to make a settlement payment of $127 million. The Company also entered into a non-prosecution agreement with the Department of Justice that contemplated a payment of $35 million. The Company settled the outstanding stockholder litigation for a payment of $14 million. Although the regulators charged some of the Company's employees with criminal activity, they did not charge the Company. The settlement was profoundly good news, and the Company's shares rose 7.5% to $24.08 on the announcement. JX 71 at 1.

Part of the settlement with the Department of Justice required the Company to operate under the terms of a consent order. Ironically, the consent order gave the Company "a competitive advantage" because many loan servicers were still trying to adjust to the new post-financial crisis regulatory regime. Tr. 61 (Harris). The Company's settlement

7

signaled that the Company had achieved compliance. Management believed this would result in a "flight to quality" as customers chose the Company over competitors whose systems had not yet been validated. *See* Tr. 61 (Harris).

Around this time, Harris told the Board he planned to retire at the end of 2013.

## G. Offers From Fidelity And Altisource

After the Company announced the settlements, two of the Company's competitors expressed interest in buying the Company. Fidelity was first out of the gate. On January 31, 2013, Fidelity and THL made a joint proposal to acquire the Company for $30.00 per share, consisting of $13.20 in cash and $16.80 in Fidelity common stock. PTO ¶ 32. The proposal represented a premium of approximately 32% over the Company's average closing stock price during the five previous trading days. JX 72 at 3.

Four days later, Altisource Portfolio Solutions S.A. ("Altisource") proposed to acquire the Company in a transaction valued at $31.00 per share, consisting of $21.50 in cash and $9.50 in Altisource common stock. PTO ¶ 33. The offer represented a 28% premium over the Company's closing price on February 1 and a 32% premium over its trailing 30-day weighted average. JX 74 at 2. Altisource competed with the Company's Analytics business. Tr. 30 (Harris).

During a meeting on February 6, 2013, the Board received a presentation from the Company's finance team. They advised the Board that 2013 would "continue to be a challenging year for the mortgage industry and for LPS." JX 75 at 464. They noted that "new entrants will emerge" and that the Company would face continuing competition from entities like Ocwen and NationStar. *Id.* They projected that the Company's revenue for

8

2013 would be "down about 4% compared to 2012, with a 4% increase in [Analytics] revenue being offset by a 9% decline in [Services] revenue." *Id.* They expected EBITDA to be flat, EBITDA margin to increase from 26.7% to 27.5%, and earnings per share to decline from $2.80 to $2.74 due to increased shares outstanding. *Id.*

The Board also heard from the Company's investor relations team. Although the Company's stock had risen by 63% in 2012 versus only a 12% increase for the S&P 500, the investor relations team believed that the market did not appreciate the Company's strong fundamentals. To address this, the team had launched a strategy to explain to the market that "LPS is a stronger company today" with "[s]ustainable competitive advantages" and "[l]ong-term growth opportunities." JX 76 at 497. The goal for 2013 was to "Achieve Fair Value of LPS Securities." *Id.* at 509; *see* Schilling Dep. 151; *see also* Tr. 358 (Schilling).

Against this backdrop, the directors considered the offers from Fidelity and Altisource. In light of Harris' prior ties to Fidelity and THL, the Board limited his role to responding to the overtures in his capacity as CEO. Lee Kennedy was the Company's Chairman, had previously served as a director of a THL portfolio company, and had served as CEO of Information Services from 2006 until 2009. The Board determined that he did not have a conflict. James Hunt was a non-management director who had served as an officer of one of THL's portfolio companies. The Board determined that he should not be involved in any discussions about a sale. The Board decided to tell Fidelity and Altisource that their offers undervalued the Company and that the Company was not interested. PTO ¶¶ 7, 34, 35.

9

## H. More Expressions Of Interest

Over the ensuing weeks, four more unsolicited expressions of interest arrived. One was an increased bid from Fidelity and THL. By letter dated February 26, 2013, they increased their proposal by 7% to $32.00 per share, with $14.72 paid in cash and $17.28 in Fidelity common stock. PTO ¶ 36. Their letter stated that $32.00 was the highest price they would offer. JX 89 at 99.

In March 2013, First American National Financial Corporation expressed interest in a joint venture between its mortgage servicing arm and the Services business. First American's proposal valued the Services business at $450-$600 million. First American said it could complete diligence in four to six weeks. Also in March, two private equity firms expressed interest in the Services business. Flexpoint Ford LLC proposed to buy the business on a cash-free, debt-free basis for 5.0x-5.5x normalized EBITDA. PTO ¶¶ 41-42. Golden Gate Capital also proposed to buy the business but did not suggest a price. PTO ¶¶ 37, 41-42.

Having received a flurry of proposals, the Board engaged Credit Suisse Securities (USA) LLC ("Credit Suisse") as a second financial advisor. The Board decided to defer considering the offers until after BCG completed its strategic review.

## I. The March 2013 Board Meeting

On March 21, 2013, the Board met to consider the Company's alternatives. The meeting began with a presentation from BCG. Based on its six months of work, BCG projected that without any new business initiatives, "[m]arket headwinds" would cause the Company's revenue to decline by $470 to $510 million by 2015 and $580 to $680 million

by 2017. JX 111 at 37. BCG attributed the declines to a 75-80% drop in refinancings and a 60-70% drop in defaults. *Id.* at 31. The declines would affect the Services business disproportionately, which would suffer 95% of the net impact. *Id.* at 70. The Analytics business would experience slow and steady growth, but not enough to offset the decline in the Services business.

BCG next presented three sets of five-year projections created in collaboration with management: (i) a Reduced Base Case, (ii) a Base Case, and (iii) an Optimistic Case. BCG regarded its Base Case as "the most likely scenario." *Id.* at 27. The Base Case started with the macro-economic trend line then added "additional initiatives and opportunities" to increase revenue. *Id.* at 28. BCG identified ten initiatives, almost all involving the Analytics business, that could generate roughly $350 million in revenue. To succeed, the Company would have to devote resources to all ten and capture market share with new products. Because the Analytics division's two biggest products already had captured 56% and 80% of their respective markets, the bulk of the Company's growth would come from new initiatives. *See* Tr. 20 (Harris); Tr. 511 (Geller); JX 111 at 51, 65. Even then, under the Base Case, 2017 revenue still would be less than 2012 revenue: Projected 6% compound annual growth rate for the Analytics business and -11% compound annual growth rate for the Services business, resulting in combined compound annual growth for the Company of -3%. JX 111 at 66.

The Reduced Base Case contemplated a forecast between doing nothing and the Base Case in which the initiatives did not fully succeed and revenue decreased by $485 million by 2017. JX 196 ¶ 89. The Optimistic Case contemplated that the initiatives would

11

succeed to a greater degree than the Base Case and generate between $651 million to $1 billion in new revenue. JX 111 at 66. BCG believed the Optimistic Case was "achievable" but "not the most likely outcome." *Id.* at 66-67. Ultimately, "everyone got comfortable with the [B]ase [C]ase." Tr. 20 (Harris).

During the same meeting, Credit Suisse and Goldman made a joint presentation. Their view of industry trends matched BCG's. *See* JX 114 at 4; JX 113 at 19. They also examined stock market trends and concluded that analysts appeared to understand the Company well because there was little difference between their consensus forecasts and the Company's actual performance. *See* JX 113 at 11. The bankers observed that since March 2012, most analysts had maintained a "hold" rating on the Company. The median price target was $25.00 with a high price target of $31.00.

Using the three cases from the BCG Report, the bankers prepared valuation models and analyzed alternatives, including an expanded share repurchase plan, a leveraged recapitalization, a spinoff of the Analytics business, a joint venture involving the Services business, a sale of the Services business, a sale of the entire Company, and a leveraged buy-out. One analysis estimated the present value of the Company's future stock price. Using an EBITDA multiple of 6.0x, the bankers estimated that if LPS achieved the Base Case, its stock would trade at $29.43 in 2015 and $41.35 in 2017. Discounted at 11%, those figures equated to present values of $23.88 and $28.70 respectively, with the former representing a 3% discount to the Company's current market price and the latter a 10% premium over market. JX 113 at 23. Using an EBITDA multiple of 7.0x, the Company's stock would trade at $35.07 in 2015 and $47.76 in 2017. Discounted at 11%, those figures

12

equated to present values of $28.46 and $31.45 respectively, implying a 15% or 28% premium over market. *Id.*

Another analysis used a discounted cash flow methodology to value the Company using the Base Case. *Id.* at 25. It generated the following range of values:

| Discount Rate | Terminal Value Next Twelve Month EBITDA Multiple: | | | |
|---|---|---|---|---|
| | **5.00x** | **6.00x** | **7.00x** | **8.00x** |
| **8.0%** | $27.14 | $31.78 | $36.36 | $40.83 |
| **9.0%** | $25.76 | $30.23 | $34.63 | $38.93 |
| **10.0%** | $24.45 | $28.76 | $32.96 | $37.12 |

The bankers separately analyzed the ability of strategic bidders and financial sponsors to finance a transaction. For strategic bidders, the bankers examined the level of accretion or dilution that a transaction would involve and the acquirer's post-transaction debt-to-equity levels, without accounting for synergies, and assuming either an all-cash deal or a transaction involving 50% cash and 50% stock at prices ranging from $30 to $34 per share. *Id.* at 42. For financial sponsors, the bankers calculated the internal rates of return that a sponsor could expect at prices of $28 to $33 per share, assuming total leverage of 5.0x and a January 1, 2018 exit. They following chart summarizes the results:

| | Illustrative Purchase Price Per Share | | | | | |
|---|---|---|---|---|---|---|
| **Exit Multiple** | **$28.00** | **$29.00** | **$30.00** | **$31.00** | **$32.00** | **$33.00** |
| **6.0x** | 20.3% | 18.1% | 16.2% | 14.4% | 12.8% | 11.3% |
| **6.5x** | 23.3% | 21.0% | 19.0% | 17.2% | 15.5% | 14.0% |
| **7.0x** | 26.0% | 23.7% | 21.6% | 19.8% | 18.0% | 16.5% |
| **7.5x** | 28.4% | 26.1% | 24.0% | 22.1% | 20.4% | 18.8% |
| **8.0x** | 30.7% | 28.4% | 26.2% | 24.3% | 22.5% | 20.9% |

*Id.* at 43. A financial sponsor thus could not pay $33 or more per share and still clear a hurdle rate of 20% unless it projected an exit at 8.0x EBITDA.

At the conclusion of the Board meeting, Credit Suisse and Goldman recommended "in light of the strategic plan review, the indications of interest that the Company had received and the Company's prior negotiating history with certain of the interested parties, that the Company would be best off if it could proceed with soliciting and evaluating offers for the sale of the Company (or its Transaction Services business)." JX 114 at 5. BCG "concurred that in their view, the best alternative for the Company would be to pursue a potential sale of the Company at an attractive price." *Id.* Management agreed, citing the "unfavorable macroeconomic trends and the market and execution risks inherent in the strategic initiatives." *Id.*

The directors decided to task Credit Suisse with contacting parties about a sale of the Company or the Services business. They asked the bankers to develop a recommendation for a sale process that the Board could evaluate and approve. PTO ¶ 43.

## J. The Recommended Sale Process

To implement the Board's directive, Company management and the financial advisors developed a list of the most likely bidders. It included six strategic buyers (Fidelity, Altisource, First American, Nationstar, CoreLogix, and IBM) and one financial sponsor (Golden Gate). All had expressed interest earlier in 2013; most had also expressed interest in 2012.

The financial advisors recommended a three-step sale process. They proposed that "given the history of discussions with [Fidelity]," the Company should first reach out to First American, Altisource, Nationstar, and Golden Gate "to create credible competitive tension in the process." JX 115 at 1. After getting "feedback" from those firms, the bankers

would contact Fidelity. Then, after receiving a first round of bids, the bankers would contact CoreLogix and IBM. The bankers also contemplated approaching other parties that were less likely to be interested in or capable of completing a transaction, such as Infosys. Tr. 515 (Geller). The bankers envisioned announcing a deal on June 11, 2013.

On March 25, 2013, the Board approved the process. PTO ¶ 44.

## K.     The Actual Sale Process

The Company and its bankers did not follow the recommended process. Rather than delaying the approach to Fidelity, management met with Fidelity on April 1, 2013. JX 121 at 3. During the same period, the bankers reached out to the other parties. Everyone but Altisource expressed interest. Altisource said it would not participate, citing the Company's exposure to declining refinancings and defaults. PTO ¶ 46.

The Company entered into confidentiality agreements with Fidelity, THL, Nationstar, Golden Gate, and First American. Management made presentations to Fidelity and Golden Gate. Management was scheduled to make a presentation to Nationstar, but they dropped out on April 9, 2013. PTO ¶ 51.

Fidelity and THL took less than two weeks to update their analysis of the Company and make a revised offer. By letter dated April 18, 2013, they offered to acquire LPS for $32.00 per share, consisting of $16.00 in cash and $16.00 in Fidelity common stock. PTO ¶ 53. It was the same price they offered in late February, but with more cash. Fidelity and THL made their offer more than a month-and-a-half faster than the timeline that the bankers had recommended.

15

On April 25, 2013, the Company announced results for the first quarter. Compared to the prior quarter, revenue decreased by 6% and EBITDA decreased by 7%. JX 133 at 3. Year over year, revenue decreased by 3% and EBITDA increased by 7%. As expected, the bulk of the decline came from the Services business. The numbers matched management's guidance and the analysts' consensus.

Management updated the Base Case in light of the Company's first quarter (the "Updated Base Case"). The new projections lowered the numbers for 2013 and 2014 but kept the figures for 2015:

| Revenue: | 2013 | 2014 | 2015 |
|---|---|---|---|
| Updated Base Case | $ 1,868.3 | $ 1,789.5 | $ 1,669.7 |
| Analyst Consensus | $ 1,861.1 | $ 1,795.7 | $ 1,845.9 |
| *% Difference* | *0.4%* | *-0.3%* | *-9.5%* |
| **EBITDA:** | | | |
| Updated Base Case | $ 523.0 | $ 536.9 | $ 506.6 |
| Analyst Consensus | $ 493.7 | $ 485.8 | $ 503.1 |
| *% Difference* | *5.9%* | *10.5%* | *0.7%* |
| **EBITDA Margin:** | | | |
| Updated Base Case | 28.0% | 30.0% | 30.3% |
| Analyst Consensus | 26.5% | 27.1% | 27.3% |
| *% Difference* | *5.5%* | *10.9%* | *11.3%* |

"[T]he modifications did not result in any significant impact" on the bankers' valuations of the Company. JX 149 at 2. The Company provided the Updated Base Case to Fidelity, First American, and Golden Gate. PTO ¶ 45; JX 189.

## L.     The Board Decides To Sell The Company.

On May 1 and 2, 2013, First American and Golden Gate submitted their indications of interest. First American proposed to buy the Services business for $450-550 million in cash. PTO ¶ 55; JX 145. First American said that it preferred a joint venture and would

increase its valuation of Services by 15-20% as part of that structure. Golden Gate proposed to have the Company contribute the Services business to a Golden Gate controlled entity in which LPS would retain a "substantial interest." JX 146 at 2. Golden Gate valued its proposal at $800 million. PTO ¶ 54.

On May 3, 2013, the Board met with its financial advisors to discuss the proposals. The bankers generated a range of values, including:

- Comparable companies: $21.46 to $30.35 per share.

- Precedent transactions: $28.09 to $34.00 per share.

- DCF analysis: $27.95 to $40.11 per share.

JX 147 at 16. At the time, LPS's stock was trading around $27.28. The Company's 52-week low was $21.14 and its 52-week high was $30.88.

To enable the Board to compare a sale of the Company with a transaction involving the Services business, the bankers analyzed the EBITDA trading multiples that the latter implied for the Analytics business, which ranged from 8.0x to 9.1x. The Fidelity offer implied a range of EBITDA trading multiples for Analytics of 9.3x to 10.4x. The Board concluded that selling the Company as a whole was the better course.

In their original plan for the sale process, the bankers envisioned using a bid from Altisource to create competition for Fidelity. Without Altisource, the Board decided to counter at $34.50 per share and ask Fidelity for a collar to support the stock component. PTO ¶ 56; JX 150. After the Board meeting on May 3, 2013, Credit Suisse conveyed this proposal to Fidelity's banker.

17

Instead of having its banker respond, Fidelity's Chairman called the Company's Chairman directly. Fidelity's Chairman was Foley, who previously had served as the Chairman of FNF Services. The Company's Chairman was Kennedy, who had served as Chairman, President, and CEO of a company that Fidelity acquired in 2006 in connection with the spinoff of FNF Services. Kennedy then served as CEO of FNF Services under Foley from 2006 through 2009. The petitioners perceive Foley's call as a way for Fidelity to capitalize on Foley's history with Kennedy and to take advantage more generally of the relationships among Fidelity, THL, and the members of the LPS Board.

The call took place on Sunday, May 5, 2013. Foley proposed to split the difference between Fidelity's offer and the Company's counter by increasing the proposed consideration to $33.25 per share. PTO ¶ 57. The composition would remain 50% cash and 50% stock, but with a one-way collar that would provide protection against a decline in Fidelity's stock price of more than 7.5%. He conveyed that Fidelity wanted the right to increase the cash component to offset the dilutive effect of issuing additional shares.

The next day, after a meeting of the Board, Credit Suisse contacted Fidelity's banker to ask for a price increase and a reduction in the percentage decline necessary to trigger the collar. Fidelity refused to increase its price but offered to improve the collar. Fidelity also agreed that if the average price of its stock increased by more than 6% and Fidelity substituted cash for shares, then the cash would reflect the upside that the Company's stockholders would have enjoyed if they received shares.

On May 14, 2013, the Board held a telephonic meeting. Credit Suisse reported on the negotiations, and the Board instructed management and the deal team to begin due

diligence on Fidelity and negotiate a merger agreement. The parties used the merger agreement they had negotiated in 2012 as a template, which included a go-shop. The parties kept the go-shop largely because of legal advice the Board received regarding its ability to mitigate potential legal risk. *See* Carpenter Dep. 124. The concept of a go-shop was not part of the bankers' design for the sale process.

On May 22, 2013, the Wall Street Journal reported that Fidelity and the Company were in merger talks. JX 171 at 1. In response, Macquarie Capital (USA) Inc. issued a report titled, "Best Outcome for LPS is to be Acquired." JX 173 at 1. Macquarie argued that "the [loan] cycle has peaked" and the deal would "rescue[] shareholders from pending fundamental slowdown." *Id.* At the time, Macquarie valued LPS at $22 per share. *Id.*

## M.     The Board Approves The Merger Agreement.

On May 27, 2013, the Board met to consider the agreement and plan of merger (the "Merger Agreement"). It contemplated consideration of $33.25 per share, paid 50% in cash and 50% in Fidelity stock (the "Original Merger Consideration"). The formula for the stock component built in a one-way collar that protected against a decline of more than 5% in the value of Fidelity's common stock and established a floor for the stock component at $15.794 per share. The Merger Agreement gave Fidelity the right to increase the cash portion and contained a formula that specified how much gain from an increase in Fidelity's stock price would flow through to the Company's stockholders.

The Merger Agreement provided for (i) a 40-day go-shop that would expire on July 7, 2013, (ii) a five-day initial match right that fell back to a two-day unlimited match right, and (iii) a $37 million termination fee for a deal generated during the go-shop. Otherwise

19

the termination fee was $74 million. The lower fee represented 1.27% of the equity value of the deal ($2.9 billion); the higher fee represented 2.5% of equity value. Once the go-shop ended, LPS could continue negotiating with any party that had achieved excluded party status or if a party made a bid that met the terms of the fiduciary out.

Credit Suisse and Goldman opined that the transaction consideration was fair. The bankers' valuations had not changed materially since their earlier assessments. Credit Suisse's ranges included:

- Comparable companies: $21.25 to $32.93 per share.

- Precedent transactions: $27.81 to $33.67 per share.

- DCF analysis: $27.67 to $39.76 per share.

JX 175 at 12. Goldman's ranges included:

- Comparable companies: $20.35 to $31.74 per share.

- Precedent transactions: $25.42 to $34.41 per share.

- DCF analysis: $26.50 to $37.25 per share.

- Present value of future share price: $21.32 to $32.97 per share.

JX 177 at 17.

The Board unanimously adopted and approved the Merger Agreement and recommended that the LPS stockholders vote in favor of the transaction.

**N.    The Go-Shop**

On May 28, 2013, the bankers started the go-shop process. They contacted twenty-five potential strategic buyers and seventeen potential financial buyers. JX 213 at 5. Only

Altisource and two financial sponsors expressed interest and executed confidentiality agreements. PTO ¶ 61.

The discussions with the financial sponsors never gained traction. Altisource, however, brought in a large team and conducted a "very rigorous level of diligence." Tr. 277 (Schilling). Altisource accessed the data room, received a management presentation, and was given the Company's projections. JX 194; JX 202; Tr. 123 (Harris). Altisource appeared serious and said they would make an offer that included an equity component. In response, the Company began conducting reverse due diligence on Altisource. Tr. 279 (Schilling); JX 199. Management generally preferred Altisource over Fidelity because they thought they would keep their jobs after a deal with Altisource. Tr. 419 (Carpenter).

On June 21, 2013, Altisource withdrew without explaining why. JX 206; Tr. 42 (Harris). There were rumors that several LPS clients did not want a competitor to acquire LPS. *See* JX 357 at 1; Tr. 189 (Harris). Credit Suisse had previously estimated that Altisource would face "a net revenue dis-synergy" from acquiring the Company because many of LPS's clients would have concerns if it were owned by a competitor, and "any theoretical cost synergy" available to Altisource "would likely be more than offset by the revenue dis-synergy with customers." JX 103.

On July 7, 2013, the go-shop ended. No one had submitted an indication of interest, much less a topping bid.

## O.    The Period Leading Up To The Stockholder Vote

In July 2013, management reported on the Company's second quarter results. Revenues decreased by 1% and EBITDA remained flat. Year over year, revenue decreased

21

by 9% and EBITDA by 13%. These results were consistent with management guidance and the consensus forecast.

On August 29, 2013, Fidelity filed a Form S-4 in connection with the transaction. The filing included the Updated Base Case, marking the first time it was publicly disclosed.

In October 2013, management reported on the Company's third quarter results. Revenue declined by 10.6% and EBITDA by 18.4%. Year over year, revenue declined by 15.8% and EBITDA by 25%. The results fell within management's guidance but at the lower end of the range. They came in below analysts' consensus estimates.

On October 31, 2013, LPS filed its definitive proxy statement relating to the Merger. The proxy statement included the Updated Base Case.

Institutional Shareholder Services and Glass Lewis & Co. recommended that stockholders vote in favor of the Merger. At a meeting of stockholders held on December 19, 2013, holders of 78.6% of the outstanding shares voted in favor of the deal. Of the shares that voted, 98.4% voted in favor.

Goldman received $22.8 million for its work on the transaction. The proxy statement revealed that Goldman had a lucrative relationship with THL that generated $97 million during the previous two years. Goldman had not previously disclosed these amounts to the Board or LPS management. They learned about the figures when they saw the proxy statement. Tr. 171 (Harris).

Credit Suisse received $21.8 million for its work on the deal. The proxy statement revealed that Credit Suisse had received $26 million from THL during the previous two

years. Credit Suisse had not previously disclosed these amounts to the Board or LPS management. The directors learned about the figures when they saw the proxy statement.

**P.     The Merger Closes.**

On January 2, 2014, the Merger closed. Fidelity's stock price had increased in the interim, resulting in an increase in the merger consideration. Fidelity elected twice to increase the cash component, which ended up at $28.10 per share. The collar yielded a stock component valued at $9.04 per share. The aggregate merger consideration received by the Company's stockholders at closing was $37.14 per share (the "Final Merger Consideration"). The equity value of the final deal was $3.4 billion, an increase of approximately $500 million over the value at signing. Net of $287 million in cash and $1.1 billion in debt, the enterprise value of the deal was $4.2 billion.

The Initial Merger Consideration of $33.25 per share and the Final Merger Consideration of $37.14 per share represented premiums of 14% and 28% respectively over the Company's unaffected market price on May 22, 2013, the last trading day before the Wall Street Journal reported on the merger discussions. The Final Merger Consideration provided a premium of approximately 20% over Altisource's expression of interest in February 2013.

Evidence in the record indicates that the Initial Merger Consideration and the Final Merger Consideration included a portion of the value that Fidelity and THL expected to generate from synergies.

- In May 2012, when THL, Blackstone, and Fidelity made an offer of $29 per share to acquire the Company, they explained that the offer price depended in part on anticipated synergies with Fidelity's ServiceLink business. JX 260 at 53.

- In March 2013, Credit Suisse made a preliminary estimate that a transaction with Fidelity could generate annual synergies of $50 to $65 million, with $40 to $50 million coming from the combination of Services and ServiceLink and another $10 to $15 million from reduced corporate overhead. JX 103.

- In May 2013, in its presentation to the Board, Credit Suisse estimated "Potential Synergies—$50mm in cost synergies in 2013E, $100mm in 2014E and $100mm thereafter. JX 180 at 45. Goldman estimated that "net synergies include $100mm in run-rate cost savings." JX 178 at 34.

- In May 2013, Fidelity made a presentation to the rating agencies that forecasted "$75 million of [annual] cost synergies" from the transaction. JX 164 at 4. Fidelity cited its "strong history of overachieving forecasted synergies." *Id.* at 8.

- The press release announcing the deal attributed the following quote to Foley, Fidelity's Chairman: "We believe there are meaningful synergies that can be generated through the similar businesses in centralized refinance and default related products, elimination of some corporate and public company costs and the shared corporate campus. We have set a target of $100 million for cost synergies and are confident that we can meet or exceed that goal." JX 186, Ex. 99.1 at 2.

- Merion internally modeled $100 million in synergies as part of its investment analysis. JX 310.

- The respondent's expert cited an analyst report which described the synergy estimate as "conservative, considering business overlap between [Services] and ServiceLink (~$2B in combined revenue) and the potential elimination of corporate and management cost redundancies." JX 296 ¶ 126.

The prospect of $100 million in synergies was a significant source of value. Using a higher discount rate than this decision adopts, the Company's expert calculated that the $100 million target would translate into approximately $660.4 million of present value, or $7.50 per share. *Id.* ¶ 128.

## Q. The Company's Post-Closing Performance

Post-closing, Fidelity divided the Company's operations into two separate subsidiaries, combined the Services business with its ServiceLink business, and issued a 35% interest in each subsidiary to THL. On March 31, 2014, KPMG LLP issued a final

financial report for the combined entity. Across the board, the Company's results came in below the Updated Base Case.

| | Actual | Updated Base Case | Actual v. Updated Base Case | |
|---|---|---|---|---|
| TD&A | $ 757.2 | $ 800.9 | ($ 43.7) | (5.5%) |
| Transaction Services | $ 965.8 | $ 1,067.3 | ($ 101.5) | (9.5%) |
| Total Revenue | $ 1,723.5 | $ 1,868.3 | ($ 144.8) | (7.8%) |
| Operating Expense | $ 1,285.1 | $ 1,345.3 | ($ 60.2) | (4.5%) |
| EBITDA | $ 438.4 | $ 523.0 | ($ 84.6) | (16.2%) |
| *% Margin* | 25.4% | 28.0% | (2.6%) | (9.1%) |
| EBIT | $ 333.0 | $ 415.1 | ($ 82.1) | (19.8%) |

JX 296 Ex. 15 (summarizing documents).

## R.     This Litigation

Merion purchased 5,682,276 shares after the announcement of the Merger and before the stockholder vote. Merion demanded appraisal, did not withdraw its demand or vote in favor of the Merger, and eschewed the Final Merger Consideration. Merion pursued this appraisal action to obtain a judicial determination of the fair value of its shares.

## II.     LEGAL ANALYSIS

"An appraisal proceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings." *Cede & Co. v. Technicolor, Inc. (Technicolor I)*, 542 A.2d 1182, 1186 (Del. 1988). Section 262(h) of the Delaware General Corporation Law (the "DGCL") states that

> the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors.

25

8 *Del. C.* § 262(h).

Because of the statutory mandate, the allocation of the burden of proof in an appraisal proceeding differs from a liability proceeding. "In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions by a preponderance of evidence." *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999).

> Each party also bears the burden of proving the constituent elements of its valuation position by a preponderance of the evidence, including the propriety of a particular method, modification, discount, or premium. If both parties fail to meet the preponderance standard on the ultimate question of fair value, the Court is required under the statute to make its own determination.

Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers & Consolidations*, 38–5th C.P.S. §§ IV(H)(3), at A-89 to A-90 (BNA) (collecting cases) [hereinafter Appraisal Rights]. "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (Strine, V.C.) (internal quotation marks omitted). "Under this standard, [a party] is not required to prove its claims by clear and convincing evidence or to exacting certainty. Rather, [a party] must prove only that it is more likely than not that it is entitled to relief." *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE).

The standard of "fair value" is "a jurisprudential concept that draws more from judicial writings than from the appraisal statue itself." *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 310 (Del. Ch. 2006) (Strine, V.C.). "The concept of fair value under Delaware law is not equivalent to the economic concept of fair market value. Rather, the concept of fair value for purposes of Delaware's appraisal statute is a largely judge-made creation, freighted with policy considerations." *Finkelstein v. Liberty Dig., Inc.*, 2005 WL 1074364, at *12 (Del. Ch. Apr. 25, 2005) (Strine, V.C.).

In *Tri-Continental Corp. v. Battye*, 74 A.2d 71 (Del. 1950), the Delaware Supreme Court explained in detail the concept of value that the appraisal statute employs:

> The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, *viz.*, his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents the true or intrinsic value, . . . the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholder's interest, but must be considered . . . .[1]

---

[1] *Id.* at 72. Subsequent Delaware Supreme Court decisions have adhered consistently to this definition of value. *See, e.g.*, *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 222 (Del. 2005); *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 553 (Del. 2000); *Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 802 (Del. 1992); *Cavalier Oil Corp. v. Hartnett*, 564 A.2d 1137, 1144 (Del. 1989); *Bell v. Kirby Lumber Corp.*, 413 A.2d 137, 141 (Del. 1980); *Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216, 218 (Del. 1975).

When applying this standard, the corporation "must be valued as a going concern based upon the operative reality' of the company as of the time of the merger, taking into account its particular market position in light of future prospects." *M.G. Bancorporation*, 737 A.2d at 525. A determination of fair value assesses "the value of the company . . . as a going concern, rather than its value to a third party as an acquisition." *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del. 1999).

"The statutory obligation to make a single determination of a corporation's value introduces an impression of false precision into appraisal jurisprudence." *In re Appraisal of Dell Inc. (Dell Fair Value)*, 2016 WL 3186538, at *22 (Del. Ch. May 31, 2016). "The value of a corporation is not a point on a line, but a range of reasonable values, and the judge's task is to assign one particular value within this range as the most reasonable value in light of all the relevant evidence and based on considerations of fairness." *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *2 (Del. Ch. July 9, 2004), *aff'd in part, rev'd on other grounds*, 884 A.2d 26 (Del. 2005).

## A.     The Deal Price As Evidence Of Fair Value

The Company contends that the Final Merger Consideration establishes a ceiling for the fair value of the Company. As the proponent of this valuation methodology, the Company bears the burden of establishing its reliability. In this case, the Initial Merger Consideration provides reliable evidence of the Company's fair value at the time of signing, and the Final Merger Consideration provides reliable evidence of the Company's fair value at the effective time.

### 1.     Deal Price As One Form Of Market Evidence

"The consideration that the buyer agrees to provide in the deal and that the seller agrees to accept is one form of market price data, which Delaware courts have long considered in appraisal proceedings." *Dell Fair Value*, 2016 WL 3186548, at \*22. *See generally* Appraisal Rights, *supra*, at A-57 to A-59. Chancellor Allen summarized the law on the use of market price data as follows:

> It is, of course, axiomatic that if there is an established market for shares of a corporation the market value of such shares must be taken into consideration in an appraisal of their intrinsic value. . . . It is, of course, equally axiomatic that market value, either actual or constructed, is not the sole element to be taken into consideration in the appraisal of stock.[2]

Numerous cases support Chancellor Allen's observations that (i) pricing data from a thick and efficient market should be considered[3] and (ii) market price alone is not dispositive.[4]

---

[2] *Cede & Co. v. Technicolor, Inc.*, 1990 WL 161084, at \*31 (Del. Ch. Oct. 19, 1990) (quoting *In re Del. Racing Ass'n*, 213 A.2d 203, 211 (Del. 1965) (citing *Tri-Cont'l*, 74 A.2d; *Chicago Corp. v. Munds*, 172 A. 452 (Del. Ch. 1934)), *rev'd on other grounds*, 636 A.2d 956 (Del. 1994).

[3] *See ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 915 (Del. Ch. 1999); *Gonsalves v. Straight Arrow Publ'rs, Inc.*, 793 A.2d 312, 316 (Del. Ch. 1998), *aff'd in pertinent part, rev'd on other grounds*, 725 A.2d 442 (Del. 1999) (TABLE); *Cooper v. Pabst Brewing Co.*, 1993 WL 208763, at \*8 (Del. Ch. June 8, 1993). Relatedly, when this court considers comparable company analyses in valuations, it effectively relies upon the market prices of the comparable companies to generate valuation metrics. *See*, *e.g.*, *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at \*18-20 (Del. Ch. Aug. 19, 2005) (Strine, V.C.); *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at \*8 (Del. Ch. May 20, 2004); *Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at \*9 (Del. Ch. July 25, 2003).

[4] *See*, *e.g.*, *Rapid–Am. Corp.*, 603 A.2d at 806 ("[T]he Court of Chancery long ago rejected exclusive reliance upon market value in an appraisal action."); *Kirby Lumber*, 413 A.2d at 141 ("[M]arket value may not be taken as the sole measure of the value of the stock."); *Del. Racing*, 213 A.2d at 211 ("It is, of course, equally axiomatic that market value, either actual or constructed, is not the sole element to be taken into consideration in

29

The trial court "need not accord any weight to [values derived from the market] when unsupported by evidence that they represent the going concern value of the company at the effective date of the merger." *M.P.M.*, 731 A.2d at 796.

"Recent jurisprudence has emphasized Delaware courts' willingness to consider market price data generated not only by the market for individual shares but also by the market for the company as a whole." *Dell Fair Value*, 2016 WL 3186548, at *23. If the merger giving rise to appraisal rights "resulted from an arm's-length process between two independent parties, and if no structural impediments existed that might materially distort the 'crucible of objective market reality,'" then "a reviewing court should give substantial evidentiary weight to the merger price as an indicator of fair value."[5]

"Here too, however, the Delaware Supreme Court has eschewed market fundamentalism by making clear that market price data is neither conclusively

_____

the appraisal of stock."); *Jacques Coe & Co. v. Minneapolis–Moline Co.*, 75 A.2d 244, 247 (Del. Ch. 1950) (observing that market price should not be exclusive measure of value); *Munds*, 172 A. at 455 ("There are too many accidental circumstances entering into the making of market prices to admit them as sure and exclusive reflectors of fair value.").

[5] *Highfields Capital, Inc. v. AXA Fin., Inc.*, 939 A.2d 34, 42 (Del. Ch. 2007); *see also M.P.M.*, 731 A.2d at 796 ("A merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value."); *Prescott Gp. Small Cap, L.P. v. Coleman Co.*, 2004 WL 2059515, at *27 (Del. Ch. Sept. 8, 2004) (explaining that "the price actually derived from the sale of a company as a whole . . . may be considered as long as synergies are excluded"); *see also Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar. 6, 1991) (commenting in an entire fairness case that "[t]he fact that a transaction price was forged in the crucible of objective market reality (as distinguished from the unavoidably subjective thought process of a valuation expert) is viewed as strong evidence that the price is fair").

determinative of nor presumptively equivalent to fair value." *Dell Fair Value*, 2016 WL

3186548, at *23.

> Section 262(h) neither dictates nor even contemplates that the Court of Chancery should consider the transactional market price of the underlying company. Rather, in determining "fair value," the statute instructs that the court "shall take into account all relevant factors." Importantly, this Court has defined "fair value" as the value to a stockholder of the firm as a going concern, as opposed to the firm's value in the context of an acquisition or other transaction. Determining "fair value" through "all relevant factors" may be an imperfect process, but the General Assembly has determined it to be an appropriately fair process. . . .

> Section 262(h) unambiguously calls upon the Court of Chancery to perform an *independent* evaluation of "fair value" at the time of a transaction. It vests the Chancellor and Vice Chancellors with significant discretion to consider "all relevant favors" and determine the going concern value of the underlying company. Requiring the Court of Chancery to defer—conclusively or presumptively—to the merger price, even in the face of a pristine, unchallenged transactional process, would contravene the unambiguous language of the statute and the reasoned holdings of our precedent. It would inappropriately shift the responsibility to determine "fair value" from the court to the private parties. Also, while it is difficult for the Chancellor and Vice Chancellors to assess wildly divergent expert opinions regarding value, inflexible rules governing appraisal provide little additional benefit in determining "fair value" because of the already high costs of appraisal actions. . . . Therefore, we reject . . . [the] call to establish a rule requiring the Court of Chancery to defer to the merger price in any appraisal proceeding.

*Golden Telecom, Inc. v. Glob. GT LP (Golden Telecom II)*, 11 A.3d 214, 217-18 (Del.

2010) (footnotes omitted).

Since *Golden Telecom II*, the Court of Chancery has regularly considered the deal

price as a relevant factor when determining fair value, but it has not deferred automatically

or presumptively to the deal price. The court also has not equated satisfying the standards

of review that govern fiduciary duty claims with carrying the burden of proof in an

appraisal proceeding. Because the two inquiries are different, a sale process might pass

31

muster for purposes of a breach of fiduciary claim and yet still constitute a sub-optimal process of an appraisal.[6]

In evaluating the persuasiveness of the deal price, this court has cautioned that "[t]he dependability of a transaction price is only as strong as the process by which it was negotiated." *Merlin P'rs LP v. AutoInfo, Inc.*, 2015 WL 2069417, at *11 (Del. Ch. Apr. 30, 2015). What is required is "a proper transactional process likely to have resulted in an

---

[6] *See In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at *16 (Del. Ch. Jan. 30, 2015) ("[A] conclusion that a sale was conducted by directors who complied with their duties of loyalty is not dispositive of the question of whether that sale generated fair value."); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *13 (Del. Ch. Nov. 1, 2013) ("[T]he issue in this case is fair value, not fiduciary duty."); *In re Orchard Enters., Inc.*, 2012 WL 2923305, at *5 (Del. Ch. July 18, 2012) (Strine, C.) ("[Respondent] makes some rhetorical hay out of its search for other buyers. But this is an appraisal action, not a fiduciary duty action, and although I have little reason to doubt [respondent's] assertion that no buyer was willing to pay Dimensional $25 million for the preferred stock and an attractive price for [respondent's] common stock in 2009, an appraisal must be focused on [respondent's] going concern value"); *see also M.P.M.*, 731 A.2d at 797 ("A fair merger price in the context of a breach of fiduciary duty claim will not always be a fair value in the context of determining going concern value."); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 30 (Del. Ch. 2014) ("A price may fall within the range of fairness for purposes of the entire fairness test even though the point calculation demanded by the appraisal statute yields an award in excess of the merger price."). *Compare Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1176-77 (Del. 1995) (affirming that merger consideration of $23 per share was entirely fair), *with Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 30 (Del. 2005) (awarding fair value in appraisal of $28.41 per share). *See generally* Charles R. Korsmo & Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 Wash. U.L. Rev. 1551, 1608 (2015) (explaining that "[s]atisfying one of the various *Revlon*-type tests . . . is not necessarily a market test" sufficient to establish fair value for purposes of appraisal); Lawrence A. Hamermesh & Michael L. Wachter, *The Fair Value of Cornfields in Delaware Appraisal Law*, 31 J. Corp. L. 119, 154 (2005) ("The dissenting shareholders need not prove breach of fiduciary duty, although such a claim is available to them, but only that the sale process was defective in some manner.").

accurate valuation of [the] acquired corporation." *LongPath Capital, LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *21 (Del. Ch. June 30, 2015). Under this standard, the court will rely "on the merger price itself as evidence of fair value, so long as the process leading to the transaction is a reliable indicator of value and any merger-specific value in that price is excluded." *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771, at *11 (Del. Ch. Oct. 21, 2015). "[T]he Court will give little weight to a merger price unless the record supports its reliability." *AutoInfo*, 2015 WL 2069417, at *11. The deal price "is informative of fair value only when it is the product of not only a fair sale process, but also of a well functioning market." *In re Appraisal of DFC Glob. Corp.*, 2016 WL 3753123, at *21 (Del. Ch. July 8, 2016).

Evaluating the reliability and persuasiveness of the deal price for purposes of establishing fair value in an appraisal proceeding is a multifaceted, fact-specific inquiry. The relevant factors can vary from case to case depending on the nature of the company, the overarching market dynamics, and the areas on which the parties focus. The last is perhaps an underappreciated aspect of appraisal jurisprudence. Because an appraisal decision results from litigation in which adversarial parties advance arguments and present evidence, the issues that the court considers and the outcome that it reaches depend in large part on the arguments that the advocates make and the evidence they present. An argument may carry the day in a particular case if counsel advance it skillfully and present persuasive evidence to support it. The same argument may not prevail in another case if the proponents fail to generate a similarly persuasive level of probative evidence or if the opponents respond effectively.

33

### 2. The Persuasiveness Of The Initial Merger Consideration

The Company demonstrated at trial that the Initial Merger Consideration provides a reliable indicator of the Company's fair value at the time of the signing of the Merger Agreement. Multiple factors contribute to this court's determination that the sale process that the Board conducted provided an effective means of price discovery.

#### a. Meaningful Competition During The Pre-Signing Phase

The first factor supporting the persuasiveness of the Company's sale process is the existence of meaningful competition among multiple bidders during the pre-signing phase.[7]

---

[7] *See, e.g., BMC*, 2015 WL 6164771, at *14-15 (giving exclusive weight to merger process where the company conducted "a robust, arm's-length sales process" that involved "two auctions over a period of several months," where the company "was able to and did engage multiple potential buyers during these periods," and where the lone remaining bidder "raised its bid multiple times because it believed the auction was still competitive"); *AutoInfo*, 2015 WL 2069417, at *12 (giving exclusive weight to merger price that "was negotiated at arm's length, without compulsion, and with adequate information" and where it was "the result of competition among many potential acquirers"); *Ancestry.com*, 2015 WL 399726, at *1 (giving exclusive weight to the deal price where the transaction resulted from an "auction process, which process itself involved a market canvas and uncovered a motivated buyer"); *id.* at *18 (describing sale effort as "an open auction process"); *CKx*, 2013 WL 5878807, at *14 (evaluating sale process and concluding that "the bidders were in fact engaged in a process resembling the English ascending-bid auction" involving direct competition between bidders); *see also Ramtron*, 2015 WL 4540443, at *9 (relying on "thorough" sale process initiated in response to "a well-publicized hostile bid and a target actively seeking a white knight"); *id.* at *21 (observing that "Ramtron actively solicited every buyer it believed could be interested in a transaction" before signing a merger agreement with the hostile bidder); *Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.*, 847 A.2d 340, 359 (Del. Ch. 2003) (Strine, V.C.) (using merger price as "best indicator of value" where the merger "resulted from a competitive and fair auction" in which "several buyers with a profit motive" were able to evaluate the company and "make bids with actual money behind them"); *cf. In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 840 n.5 (Del. Ch. 2011) (noting "the importance of the pre-signing phase to developing price competition among private equity bidders"). *See generally* Brian JM Quinn, *Bulletproof: Mandatory Rules for Deal Protection*, 32 J. Corp. L. 865, 879-80 (2007) [hereinafter

Scholars who study auction design agree on the importance of creating competition among multiple bidders.[8] Renowned M&A practitioner Marty Lipton has contrasted the effects of adding another interested party at the front end of a negotiation with the effect of bargaining more vigorously with a single counterparty at the back end. Lipton even roughly quantified the added value of adding another interested party: "The ability to bring somebody into a situation is far more important than the extra dollar a share at the back end. At the front

---

*Bulletproof*] (surveying literature on auction theory and concluding that "[t]he two key insights are that competition, or the threat of competition, will lead to a price closer to the buyer's reservation price and that the price effect of one additional competitor is greater than the price effects attributable to bargaining").

[8] *See* Jacob K. Goeree & Theo Offerman, *Competitive Bidding in Auctions with Private and Common Values*, 113 Econ. J. 598, 611 (2003) (explaining that having "all potentially interested bidders participate" before signing produces "more competition [and] results in a more efficient allocation" of surplus between the buyer and seller); *id.* at 600 ("Another factor improving efficiency is an increase in competition: expected efficiency and expected revenue increase with each extra bidder. In the limit when the number of bidders goes to infinity, an efficient allocation again materializes. Interestingly, the effect of more competition on efficiency and revenues is stronger than the effect of information provided by the auctioneer. When the seller has the choice between finding more interested bidders or providing information about the value of the commodity, she should choose the former."); Jeremy Bulow & Paul Klemperer, *Auctions Versus Negotiations*, 86 Am. Econ. Rev. 180, 180 (1996) (conducting empirical study and concluding that "a single extra bidder more than makes up for any diminution in negotiating power" such that "there is no merit in arguments that negotiation should be restricted to one or a few bidders to allow the seller to maintain more control of the negotiating process, or to credibly withdraw the company from the market"); *cf.* Nihat Aktas et al., *Negotiations Under the Threat of an Auction*, 98 J. Fin. Econ. 241, 242 (2010) (finding that "that target-initiated deals are more often auctions while negotiations are more frequently initiated by bidders").

35

end, you're probably talking about 50%. At the back end, you're talking about 1 or 2 percent."[9]

Equally important, the Company's process involved different types of bidders, which is critical for promoting competition.[10] "[T]he most important driver of market efficiency for [change of control] transactions [is] heterogeneous buyers." Subramanian, *supra*, at 713. Among homogenous bidders, a sale process functions as a common-value auction, but with heterogeneous bidders, the sale process functions as a private-value

---

[9] Guhan Subramanian, *The Drivers of Market Efficiency in* Revlon *Transactions*, 28 J. Corp. L. 691, 691 (2003) (quoting Author's Interview with Martin Lipton, Senior Partner, Wachtell, Lipton, Rosen & Katz, in New York, NY (June 14, 2000)).

[10] *See DFC Glob.*, 2016 WL 3753123, at *21 (giving weight to deal price where sale process "involved DFC's advisor reaching out to dozens of financial sponsors as well as several potential strategic buyers"); *BMC*, 2015 WL 6164771, at *14 (giving exclusive weight to merger process where the company conducted "a robust, arm's-length sales process" that included "two auctions over a period of several months" and involved both financial sponsors and strategic buyers); *AutoInfo*, 2015 WL 2069417, at *3 (relying exclusively on deal price where financial advisor contacted 164 potential strategic and financial acquirers, approximately 70 signed NDAs and received a confidential information memorandum, interested parties received several weeks of due diligence, ten bidders submitted indications of interest, and nine moved on to a second round); *Ramtron*, 2015 WL 4540443, at *23 (relying exclusively on deal price where financial advisor "(1) contacted twenty-four third parties . . .; (2) sent non-disclosure agreements ('NDAs') to twelve . . .; (3) received executed NDAs from six . . .; and (4) remained in discussions with [three]"); *Ancestry.com*, 2015 WL 399726, at *3 (relying exclusively on deal price where process that involved discussion with fourteen potential bidders, including six potential strategic buyers and eight financial sponsors); *CKx*, 2013 WL 5878807, at *4-5 (relying exclusively on deal price where sale process in which sell-side financial advisor reached out to multiple financial and strategic buyers). *Compare Dell Fair Value*, 2016 WL 3186538, at *7-10, *29, *36-37 (giving limited weight to deal price where pre-signing phase involved no strategic bidders and only two financial sponsors, one of which dropped out, as did the firm invited to replace it).

auction.[11] The latter is better for the seller because in a private-value auction, "honest reporting of values is a dominant strategy for bidders."[12] Finding heterogeneous bidders generally means involving strategic buyers.[13] Financial sponsors, by contrast, predominantly use the same pricing models, the same inputs, and the same value-creating techniques.[14] Absent distorted market conditions, "strategic bidders are systematically willing to pay more than financial bidders,"[15] and the fact that "average returns to

[11] A common value auction is one in which "every bidder has the same value for the auctioned object." Peter Cramton & Alan Schwartz, *Using Auction Theory to Inform Takeover Regulation,* 75 L. Econ. & Org. 27, 28-29 (1991). A private value auction is one in which "the value of the auctioned object differs across potential acquirers." *Id.*

[12] Jeremy Bulow & John Roberts, *The Simple Economics of Optimal Auctions*, 97 J. Pol. Econ. 1060, 1065 (1989); *accord* Paul Klemperer, *Auction Theory: A Guide to the Literature*, 13 J. Econ. Survs. 227, 230 (1999).

[13] *See* Paul Povel & Rajdeep Singh, *Takeover Contests with Asymmetric Bidders*, 19 Rev. Fin. Stud. 1399, 1399-1400 (2006); Christina M. Sautter, *Auction Theory and Standstills: Dealing with Friends and Foes in A Sale of Corporate Control*, 64 Case W. Res. L. Rev. 521, 529 (2013).

[14] *See Dell Fair Value*, 2016 WL 3186538, at *30 ("[T]he outcome of competition between financial sponsors primarily depends on their relative willingness to sacrifice potential IRR."); *see also* Povel & Singh, *supra*, at 1399-1400. *See generally* Paul Gompers, Steven N. Kaplan, & Vladimir Mukharlyamov, *What Do Private Equity Firms Say They Do?*, 121 J. Fin. Econ. 449, 450 (2016) (noting predominance of similar techniques and strategies across private equity firms). An exception would be a financial buyer with a synergistic portfolio company, which would provide a source of private value.

[15] Alexander S. Gorbenko & Andrey Malenko, *Strategic & Financial Bidders in Takeover Auctions*, 69 J. Fin. 2513, 2514 (2014); *see id.* at 2532 (finding that the "average valuation of a strategic (financial) bidder of an average target is 16.7% (11.7%) above its value under the current management"); *id.* at 2538 ("Not only do strategic acquirers pay, on average, higher premiums than financial acquirers, but the maximum premiums that they are willing to pay are considerably higher."); Mark E. Thompson & Michael O'Brien, *Who Has the Advantage: Strategic Buyers or Private Equity Funds?*, Financier Worldwide (Nov. 2005) ("Strategic buyers have traditionally had the advantage over private equity

[strategic] acquirers are close to zero or even negative" suggests that acquirers pay full value for targets, inclusive of the benefits of control and synergies. *See* Gorbenko & Malenko, *supra*, at 2537. Financial buyers, by contrast, generally pay lower premiums[16] and are hampered by limitations on leverage and the need to achieve their internal hurdle rates.[17]

In this case, the Board conducted a sale process that involved a reasonable number of participants and created credible competition among heterogeneous bidders during the pre-signing phase. The process began after the Board received five unsolicited indications of interest, with three from strategic buyers (Fidelity, Altisource, and First American) and

---

funds, particularly in auctions, because strategic buyers could pay more because of synergies generated from the acquisition that would not be enjoyed by a fund.").

[16] *See* Steven N. Kaplan & Per Strömberg, *Leveraged Buyouts and Private Equity*, 23 J. Econ. Perspectives 121, 122 (2009) ("[T]here is also evidence consistent with private equity investors taking advantage of market timing (and market mispricing) between debt and equity markets particularly in the public-to-private transactions of the last 15 years."); *id.* at 136 ("[P]rivate equity firms pay lower premiums than public company buyers in cash acquisitions. These findings are consistent with private equity firms identifying companies or industries that turn out to be undervalued. Alternatively, this could indicate that private equity firms are particularly good negotiators, and/or that target boards and management do not get the best possible price in these acquisitions."); *id.* at 135-36 ("[P]ost-1980s public-to-private transactions experience only modest increases in firm operating performance, but still generate large financial returns to private equity funds. This finding suggests that private equity firms are able to buy low and sell high.").

[17] *See DFC Glob.*, 2016 WL 3753123, at *22; *Dell Fair Value*, 2016 WL 3186538, at *29; *see also* Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions* 235-36 (2009) (explaining that a sponsor's ability to pay in a leveraged buy-out is constrained by "leverage capacity, credit market conditions, and the sponsor's own IRR hurdles").

two from financial sponsors (Flexpoint and Golden Gate). The Board did not immediately enter into negotiations or launch a sale process. Instead it awaited the results of BCG's analysis and obtained input from management and its financial advisors about strategic alternatives. With the benefit of that information, including estimates of the Company's standalone value based on BCG's scenarios, the Board was well-positioned to solicit bids for the Company and its Services business and to evaluate those bids against other possibilities, including remaining a standalone entity. Having decided to solicit bids, the Board went beyond the parties who had submitted unsolicited expressions of interest by identifying three additional strategic buyers. The Board's financial advisors approached all of the potential bidders on equal terms, and all knew that the Board was conducting a sale process and so faced the prospect of competition when formulating their offers.

The petitioners have argued that although the Board may have set out to generate competition, its efforts failed because Altisource decided not to bid. They say that this left Fidelity without any competition as the only strategic bidder for the whole Company. It is possible that a single-bidder process, even one that would be defensible from a fiduciary duty standpoint, could be unpersuasive for purposes of price discovery for an appraisal. In *CKx*, for example, the court relied exclusively on the market price, but stressed that the case involved meaningful pre-signing competition and was not one in which "the only evidence that a merger price was the result of 'market' forces was a post-signing go-shop period (which failed to produce competing bids) . . . ." 2013 WL 5878807, at *13. Likewise in *Orchard Enterprises*, the court declined to give weight to the merger price in an appraisal action where "the trial did not focus extensively on the quality of marketing . . . or the

utility of the 'go shop' provision in the merger agreement, which could obviously have been affected by [a large stockholder's] voting power and expressed interest to acquire all of [the company] for itself." 2012 WL 2923305, at *5.

Importantly, however, if bidders perceive a sale process to be relatively open, then a credible threat of competition can be as effective as actual competition:

> Even when there is only one buyer, that buyer could feel compelled to act as if there were more. In a perfectly contestable market, competitive pressures exerted by the perpetual threat of entry (as well as by the presence of actual rivals) induce competitive behavior. Free entry is a sufficient condition for a market to be perfectly contestable. . . .

Aktas et al., *supra*, at 242-43. Consequently, "competition need not be observed ex post for the M&A market to be efficient." *Id.* at 242. "Competition, *or the threat of competition*, is a strong incentive for buyers to make higher bids for sellers." *Bulletproof*, *supra*, at 884 (emphasis added); *see also id* at 879-80 (surveying literature on auction theory and concluding that "[t]he two key insights are that competition, or the threat of competition, will lead to a price closer to the buyer's reservation price and that the price effect of one additional competitor is greater than the price effects attributable to bargaining").

During the pre-signing phase, Fidelity and THL did not know that Altisource had dropped out. They instead knew that the Company was conducting a sale process involving multiple parties, and they also knew that the merger agreement that they had negotiated with the Company in 2012 and planned to use as the framework for their 2013 deal included a go-shop, which could create a path for post-signing competition by a strategic

competitor.[18] In this case, the Company established the presence of a competitive dynamic during the pre-signing phase that that generated meaningful price discovery.

Reinforcing the threat of competition from other parties was the realistic possibility that the Company would reject the Fidelity/THL bid and pursue a different alternative. Fidelity and THL had approached the Company previously in 2010, 2011, and 2012. Each time, the Board had declined to pursue a transaction. In 2012, the Board had rejected premium bids of $26.50, $28.00, and $29.00 per share, choosing instead to continue operating the Company on a stand-alone basis. In early 2013, the Board also rejected Fidelity/THL's preliminary indication of interest of $30.00 per share. The Board's track record of saying "no" gave Fidelity/THL a credible reason to believe that the Board would not sell below its internal reserve price. *See* Tr. 483 (Carpenter) ("And I might add that [Fidelity] had learned in prior times that we would walk away when they didn't raise their bid.").

By citing the involvement of multiple, heterogeneous bidders during the pre-signing phase, this decision is not suggesting any legal requirement to engage with multiple bidders. There may be sound business reasons for not doing so, and "[n]othing in our

---

[18] *See Dell Fair Value*, 2016 WL 3186538, at *36 ("[T]he prospect of post-signing competition can help raise the price offered during the pre-signing phase."); Brian JM Quinn, Omnicare: *Coercion and the New* Unocal *Standard*, 38 J. Corp. L. 835, 844 (2013) ("[K]nowing that a transaction will include a go-shop, wherein the seller will treat the initial bidder as a stalking horse to generate an active post-signing auction, may incent initial bidders to offer a preemptive bid to deter subsequent bids. In that view, the prospect of competition, even if no competition subsequently emerges, should be sufficient incentive for a bidder to shift transaction surplus to the seller.").

jurisprudence suggests that an auction process need conform to *any* theoretical standard." *CKx*, 2013 WL 5878807, at \*14. As this court has observed, "a multi-bidder auction of a company" is not a "prerequisite to finding that the merger price is a reliable indicator of fair value." *Ramtron*, 2015 WL 4540443, at \*21. The point of citing the involvement of multiple bidders in this case is more limited. It is simply that because the Company contacted a reasonable number of heterogeneous bidders during the pre-signing phase, its argument for reliance on the deal price (all else equal) is more persuasive.[19]

### b. Adequate And Reliable Information During The Pre-Signing Phase

Another factor supporting the effectiveness of the sale process in this case was that adequate and reliable information about the Company was available to all participants, which contributed to the existence of meaningful competition. Delaware cases have questioned the validity of a sale process when reliable information is unavailable for reasons that have included regulatory uncertainty[20] and persistent misperceptions about the corporation's value.[21] A company also can create informational inadequacies by providing

---

[19] The focus is on a reasonable number of bidders, rather than all potential bidders, because as the number of bidders increases, the marginal value of each additional bidder declines. "At about 10 bidders, you'll get 85% of the revenue that you could expect to get from an auction with 50 bidders." Guhan Subramanian, *Negotiation? Auction? A Deal Maker's Guide*, Harv. Bus. Rev. (Dec. 2009), https://hbr.org/2009/12/negotiation-auction-a-deal-makers-guide.

[20] *See DFC Glob.*, 2016 WL 3753123, at \*21.

[21] *See Dell Fair Value*, \*32 ("A second factor that undermined the persuasiveness of the Original Merger Consideration as evidence of fair value was the widespread and compelling evidence of a valuation gap between the market's perception and the

disparate information to bidders. *See* Goeree & Offerman, *supra*, at 600. If a seller only makes information available to one bidder, then the seller has given that bidder a subsidy. *See id.* The effect of disparate information is greater in a common value auction than in a private value auction.[22] Strategic buyers, who have their own private sources of value and trade-based informational advantages, are less affected by information disparities than financial buyers, who are more susceptible to the winner's curse. *See Dell Fair Value*, 2016 WL 3186538, at *42; Denton, *supra*, at 1546.

In this case, all bidders received equal access to information about the Company. All had the opportunity to conduct due diligence before submitting their bids, and several did so. There is no evidence in the record suggesting that the Company or its advisors provided any particular bidder with informational advantages. This is also not a case where the size of the Company or the nature of its business made it difficult to understand and assess. *Cf. Dell Fair Value*, 2016 WL 3186538, at *40-41. Every bidder who submitted an

---

Company's operative reality."). In the *Dell Fair Value* decision, the misperception resulted from "(i) analysts' focus on short-term, quarter-by-quarter results and (ii) the Company's nearly $14 billion investment in its transformation, which had not yet begun to generate the anticipated results." *Id.*

[22] J. Russel Denton, Note, *Stacked Deck: Go-Shops & Auction Theory*, 60 Stan. L. Rev. 1529, 1536 (2008) (citing Jeremy Bulow, Ming Huang & Paul Klemperer, *Toeholds and Takeovers*, 107 J. Pol. Econ. 427, 430 (1999)). In an ascending private value auction, the winning bidder is more likely to have prevailed because it has a greater private value than the next highest bidder. *See* Denton, *supra*, at 1536. In common value auctions, the prospect of information asymmetries drives the winner's curse. *See Dell*, 2016 WL 3186538, at *42; Paul Povel & Rajdeep Singh, *Takeover Contests with Asymmetric Bidders*, 19 Rev. Fin. Stud. 1399-1400 (2006).

indication of interest, including Altisource in early 2013, identified a limited amount of time for conducting due diligence, typically four weeks.

The record in this case lacked persuasive evidence of factors that would undermine the reliability of information that bidders received, such as a regulatory overhang or a significant disconnect between the Company's unaffected market price and informed assessments of fair value by insiders. *Compare DFC Glob.*, 2016 WL 3753123, at \*21; *Dell Fair Value*, 2016 WL 3186538, at \*32-36. The petitioners have pointed to the legal uncertainty that surrounded the Company and the proximity of the sale process to the settlements that the Company announced in January 2013. They argue that stockholders did not sufficiently understand the Company's significant value once its legal risk had been addressed. It is true that there was a regulatory overhang from the investigations in the Company's involvement in robo-signing and related stockholder litigation, but the settlements cleared up those issues. The weight of the evidence at trial indicated that the settlements made the Company easier to understand, and the Company's stock price increased substantially following the announcement of the settlements.

The record in this case lacked persuasive indications of irrational or exaggerated pessimism, whether driven by short-termism or otherwise, that could have anchored the price negotiations at levels below fair value.[23] A variety of factors indicated that the market

---

[23] *See Dell Fair Value*, 2016 WL 3186538, at \*33-36 (explaining why record supported existence of significant valuation gap, driven by short-term pessimism, that depressed the market price and anchored price negotiations below fair value); Malcom Baker, Xin Pan, & Jeffery Wurgler, *The Effect of Reference Point Prices on Mergers and Acquisitions*, 106 J. Fin. Econ. 49, 50 (2012) (finding the "26-week high price [of a

price was providing a reliable valuation indicator. Management believed that its efforts to educate the market had succeeded, that the Company's stockholders understood its business, and that they were focused on its long-term prospects. Since 2011, analysts had established a pattern of accurately predicting the Company's performance. The valuation ranges that the Company's advisors generated in 2012 and 2013 using DCF analyses were also generally consistent with market indicators. *See* JX 33 at 17.

### c. Lack Of Collusion Or Unjustified Favoritism Towards Particular Bidders

A third factor supporting the effectiveness of the sale process in this case was the absence of any explicit or implicit collusion, whether among bidders or between the seller and a particular bidder or subset of bidders.[24] Under Delaware law, only an "arms-length

---

particular stock] has a statistically and economically significant effect on offer prices [in mergers and acquisitions], and the 39-, 52-, and 65-week high prices also have independent explanatory power" and speculating as to the causes of this reference point effect); *id.* at 64-65 (finding that deals with higher premiums tend to close more often, which is "consistent with reference point behavior."); Inga Chira & Jeff Madura, *Reference Point Theory and Pursuit of Deals*, 50 Fin. Rev. 275, 277, 299 (2015) ("Our analysis reveals that a higher target 52-week reference point, relative to the target's current stock price, . . . increases the likelihood of a management buyout (MBO). . . . Overall, the results from our analyses offer strong evidence that target and bidder reference points serve as potent anchors that shape the outcomes and structures of mergers."); Sangwon Lee & Vijay Yerramilli, *Relative Values, Announcement Timing, and Shareholder Returns in Mergers and Acquisitions* 2 (January 2016) (unpublished manuscript) (adopting finding of Baker, Pan, & Wurger, *supra*, that "key decision makers in the bidding and target firms and investors are likely to use recent prices as reference points"). *See generally* Guhan Subramanian, *Negotiauctions: New Dealmaking Strategies for a Competitive Marketplace*, 16-18 (2010) (explaining that anchoring "works by influencing your perceptions of where the [zone of possible agreement] lies").

[24] *See M.P.M.*, 731 A.2d at 796 ("A merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair

merger price resulting from an effective market check" is "entitled to great weight in an appraisal." *Glob. GT LP v. Golden Telecom, Inc. (Golden Telecom I)*, 993 A.2d 497, 508-09 (Del. Ch. 2010) (Strine, V.C.), *aff'd*, 11 A.3d 214 (Del. 2010). A common risk in corporate sale processes is the possibility that management will favor a particular bidder for self-interested reasons, even if the favoritism does not rise to the level of an actionable breach of duty; a reliable sales process avoids that taint.[25]

---

value."); Paul Klemperer, *What Really Matters in Auction Design*, 16 J. Econ. Persp. 169, 170 (2002) (citing "the risk that participants may explicitly or tacitly collude to avoid bidding up prices").

[25] *See DFC Glob.*, 2016 WL 3753123, at *21 (giving weight to deal price where "[t]he deal did not involve the potential conflicts of interest inherent in a management buyout or negotiation to retain existing management"); *CKx*, 2013 WL 5878807, at *13 (giving exclusive weight to sales process where "[t]he record and the trial testimony supports a conclusion that the process by which [the company] was marketed to potential buyers was thorough, effective, and free from any spectre of self-interest or disloyalty."). For these and other reasons, "the weight of authority suggests that a claim that the bargained-for price in an MBO represents fair value should be evaluated with greater thoroughness and care than, at the other end of the spectrum, a transaction with a strategic buyer in which management will not be retained." *Dell Fair Value*, 2016 WL 3186548, at *28. *See* Iman Anabtawi, *Predatory Management Buyouts*, 49 U.C. Davis L. Rev. 1285, 1320 (2016) (discussing factors that undermine pricing efficiency in the market for corporate control when the transaction is an MBO); Matthew D. Cain & Steven M. Davidoff, *Form Over Substance? The Value of Corporate Process and Management Buy-Outs*, 36 Del. J. Corp. L. 849, 862 (2011) ("There is a more concrete argument against MBOs on fairness grounds. It is the prospect that management is utilizing inside information when it arranges an MBO. Management by its inherent position has in its possession non-public knowledge of the corporation, and management can use this informational asymmetry between itself and public shareholders to time the buy-out process. MBOs can thus be arranged at advantageous times in the business cycle or history of the corporation." (footnotes omitted)); Marcel Canoy, Yohanes E. Riyanto & Patrick van Cayseele, *Corporate Takeovers, Bargaining and Managers' Incentives to Invest*, 21 Managerial & Decision Econs. 1, 2, 14 (2000) ("Long-term investments, such as R&D investments, are slow yielding and more difficult to be evaluated by the market, despite the fact that they could generate higher profits. Consequently, firms investing heavily in long-

46

The Merger was not an MBO. To the contrary, the Company's management team believed that Fidelity would not retain them if it acquired the Company. This gave the management team a powerful personal incentive not to favor Fidelity and not to seek (consciously or otherwise) to deliver the Company to Fidelity at an advantageous price. Instead it gave the management team an additional incentive to seek out other bidders and create competition for Fidelity.

---

term projects may be more susceptible to a takeover attempt. . . . If being taken over is better than taking over [for target management] . . . then obviously, [management] would like to overinvest to facilitate a takeover . . . ."); Deborah A. DeMott, *Directors' Duties in Management Buyouts and Leveraged Recapitalizations*, 49 Ohio St. L.J. 517, 536 (1988) (explaining that overhang from past acquisitions may artificially depress a company's stock market price and make the buyout price appear generous); James R. Repetti, *Management Buyouts, Efficient Markets, Fair Value, and Soft Information*, 67 N.C. L. Rev. 121, 125 (1988) ("Other methods for management to realize large gains in management buyouts are not as innocuous as the use of leverage or as apparently innocuous as increasing cash flow. Management may actively depress the price of the shares prior to the management buyout in order to reduce the price they have to pay. Management may accomplish this by . . . channeling investments into long-term projects which will not provide short-term returns."); James Vorenberg, *Exclusiveness of the Dissenting Stockholder's Appraisal Right*, 77 Harv. L. Rev. 1189, 1202-03 (1964) ("Far more difficult is ensuring to departing stockholders the benefit of improved prospects, where, at the time of appraisal, the evidence of improvement is more intuitive than tangible. . . . The appraisal process will tend to produce conservative results where the values are speculative, and the majority's power to pick the time at which to trigger appraisal may encourage them to move when full values may be temporarily obscured." (footnote omitted)); *see also* Benjamin Hermalin & Alan Schwartz, *Buyouts in Large Companies*, 25 J. Legal Stud. 351, 356 (1996) ("With respect to timing, the firm could initiate a freeze-out (i) before it invests effort, (ii) after it invests effort but before the value of the firm conditional on effort is revealed, or (iii) after the value of the firm is revealed but before earnings are realized. We generally assume that the firm would wait until point iii because waiting in the model is costless but produces gains: were the firm to initiate a freeze-out before it learns its value, it might have to pay too much.").

The petitioners have pointed to ties among Fidelity, THL, and members of the Board which they say undermined the sale process in general and the price negotiation in particular. It is true that there were relationships among Fidelity, THL, and members of the Board, in large part because of the Company's history. Recall that Fidelity purchased the Alltel financial division that eventually became the Company in 2003, reorganized it as part of FNF Services, then spunoff FNF Services in 2006. FNF Services in turn spun off the Company in 2008. The Company's CEO, Harris, had consulted for Fidelity and THL on the Alltel acquisition and managed FNF Services from 2002 through 2006. Kennedy, the Company's Chairman, had served as CEO of FNF Services from 2006 through 2009, and during that time Foley, the Chairman of Fidelity, was Executive Chairman of FNF Services. Hunt, another outside director, served as an officer of one of THL's portfolio companies. The Company and Fidelity also shared a common business campus in Jacksonville, Florida (although they occupied separate office buildings).

These relationships warranted close examination, but they did not compromise the sale process. Harris interacted with Fidelity and other bidders in his capacity as CEO, but he recused himself from deliberating as a director during the 2013 sale process. Hunt also recused himself. Kennedy participated only after the Board determined that he did not have a conflict. All of the members of the Board and management were net sellers in the deal, and they collectively expected to receive approximately $100 million from the Merger in stock-based compensation. *See* JX 260 at 91-99; Tr. 784 (Hausman). Harris in particular had an incentive to maximize the value of his shares, because he planned to retire. As noted, the management team as a whole believed that if Fidelity acquired the Company, they

48

would not retain their positions, meaning that maximizing the value of the merger consideration was the best way for them to obtain value from the deal. There also was a history of competition between Fidelity's ServiceLink business and the Company, and during the sale process management resisted providing sensitive information to what it regarded as its closest competitor. *See* JX 46.

The petitioners complain the loudest about the call that Foley made to Kennedy, where Foley proposed consideration of $33.25 per share, essentially splitting the difference between Fidelity's offer of $32 per share and the Company's counteroffer of $34.50 per share. Although the Company's bankers made one more try to get more consideration, the headline price term was effectively set during that telephone call, and negotiations from that point on revolved around the collar and other aspects of the deal. The petitioners seem to believe that during that call, Kennedy committed to $33.25 per share, ending the negotiations at a point below where they would have ended up otherwise. But Kennedy did not have authority to lock the Board in to $33.25 per share, and the Board in fact had its bankers push back once more. Nor is it clear that the negotiations would have ended in a different place if Fidelity's banker had responded to Credit Suisse, as the petitioners would have preferred.

More importantly, the record indicates that even at $33.25 per share, the deal price included a portion of the synergies that Fidelity and THL hoped to achieve from the transaction, including revenue synergies from combining the Company's Services business with Fidelity's ServiceLink unit. Assuming for the sake of argument that a negotiator without a historical relationship with Foley might have extracted more than $33.25 per

share, the record indicates that the additional amount would have represented a portion of the combinatorial value of the Company to Fidelity, not increased going concern value to which the petitioners would be entitled in an appraisal. "A merger price resulting from arms-length negotiations . . . is a very strong indication of fair value," but it "must be accompanied by evidence tending to show that it represents the going concern value of the company rather than just the value of the company to one specific buyer." *M.P.M.*, 731 A.2d at 797. "The fact that a board has extracted the most that a particular buyer (or type of buyer) will pay does not mean that the result constitutes fair value." *Dell Fair Value*, 2016 WL 3186538, at \*29. Likewise, the fact that a negotiator has failed to extract the most a particular buyer (or type of buyer) will pay does not mean that what the negotiator obtained did not already exceed fair value. In *Dell*, the former was true. In this case, the latter was true.

### d.  Conclusion Regarding The Initial Merger Consideration

The evidence at trial established that the Initial Merger Consideration is a reliable indicator of fair value as of the signing of the Merger Agreement. The evidence indicating that the transaction price included synergies suggests that the fair value of the Company as of the signing of the Merger Agreement would not have exceeded the value of the Initial Merger Consideration. The valuation date for purposes of an appraisal, however, is not the date on which the Merger Agreement was signed, but rather the date on which the merger closes.

### 3.  Evidence From The Post-Signing Period

Over seven months elapsed between the signing of the Merger Agreement on May 27, 2013, and the closing of the merger on January 2, 2014. The parties have to address this temporal gap, because "[t]he time for determining the value of a dissenter's shares is the point just before the merger transaction 'on the date of the merger.'" *Appraisal Rights* A-33 (quoting *Technicolor I*, 542 A.2d at 1187). Consequently, if the value of the corporation changes between the signing of the merger and the closing, the fair value determination must be measured by the "operative reality" of the corporation at the effective time of the merger. *Cede & Co. v. Technicolor, Inc. (Technicolor II)*, 684 A.2d 289, 298 (Del. 1996).

Neither side presented analyses of the potential for valuation change between signing and closing. Neither analyzed changes in value of market indices or (arguable) peer companies. Neither attempted to use these metrics to bring the Company's market price forward, as parties sometimes historically did under the Delaware Block Method. *See* Appraisal Rights, *supra*, at A-58 (collecting cases). The petitioners pointed to the existence of the temporal gap as a reason not to rely on either the deal price or market-based metrics associated with the signing of the deal. They argued that in light of the temporal gap, the court should construct its own valuation as of the closing date.

The respondent approached the temporal gap differently. They argued that (i) the failure of a topping bid to emerge between announcement of the deal and the stockholder vote validated the deal price, (ii) the Company's performance declined during the gap period, and (iii) Fidelity's stock traded up, resulting in the Company's stockholders receiving the higher Final Merger Consideration. The respondent argued that the Final

51

Merger Consideration therefore exceeded fair value, particularly because of evidence that the deal included combinatorial synergies.

Taken as a whole, the evidence at trial established that the Final Merger Consideration was a reliable indicator of fair value as of the closing of the Merger and that, because of synergies and a post-signing decline in the Company's performance, the fair value of the Company as of the closing date did not exceed the Final Merger Consideration.

### a. The Absence Of A Topping Bid

During the seven-month period between signing and closing, no other bidder submitted an indication of interest or made a competing proposal. During the first forty days of the post-signing period, the Company conducted a go-shop. After that, until the meeting of stockholders on December 19, 2014, the Company was free to respond to a topping bid that constituted a Superior Proposal. The time leading up to the meeting of stockholders amounted to a five-month window-shop.

A go-shop period is less common in deals involving strategic buyers like Fidelity than in MBOs involving private equity sponsors.[26] MBOs in which a management team has affiliated with an incumbent financial sponsor rarely generate topping bids, particularly

---

[26] *See* JX 296 ¶ 79 (finding that a merger agreement contained a go-shop in only 4% of sample of transactions that involved a strategic entity buying a publicly traded U.S. target for a deal price above $100 million); *id.* ¶ 80 (finding that only 1% of transactions had an auction and a go-shop where strategic buyers acquired a U.S. publicly traded target for a deal price above $100 million).

from other financial sponsors.[27] It is not clear how a go-shop in a deal with a strategic acquirer would affect the behavior of other strategic bidders. It seems logical that relative to a deal without a go-shop, a strategic buyer would be more likely to compete when a deal involved a go-shop.

In this case, however, several factors undermined the efficacy of the go-shop. First, it was not part of the bankers' plan for the sale process. The parties appear to have kept the go-shop because of legal advice indicating that it would help mitigate litigation risk in the event a stockholder sued the board for breach of fiduciary duty. The bankers gave no advice regarding the timing or structure of the go-shop, and the respondent's counsel invoked the attorney-client privilege to block discovery into discussions regarding the go-shop. The go-shop appears to have been a lawyer-driven add-on.

Second, the quality of the contacts during the go-shop is suspect. It is true that the Company's financial advisors contacted twenty-five potential strategic buyers and seventeen potential financial buyers, which are impressive headline numbers. The bulk of those companies, however, already had demonstrated that they were not interested in

---

[27] *See* Denton, *supra*, at 1547 ("In the sixty-three deals that utilized go-shop provisions, there have been nine deals with jump bids. Furthermore, there were jump bids in none of the MBOs containing go-shops . . . . Of the nine jump bids that were made, strategic buyers made seven." (footnotes omitted)); *id.* at 1549 ("[G]o-shops have structures that discourage bidding wars between financial buyers. Management involvement with the initial private equity bidder only increases the advantages that are given to the initial bidder, since it gives the initial bidder better information about the value of the target. Despite appearing to encourage additional bidders and a post-signing auction, go-shop provisions are structured in a way that discourages financial buyers from bidding for the company.").

acquiring the Company, had been ruled out by the Board and its bankers as unlikely transaction partners, or were "the usual opportunities." Carpenter Dep. 129-30.

Only Altisource and two financial buyers expressed interest during the go-shop period. Neither bid. One could view the lack of interest and absence of bidding during the go-shop phase as providing support for the proposition that the Initial Merger Consideration equaled or exceeded fair value. *See Highfields Capital, Inc. v. AXA Fin., Inc.*, 939 A.2d 34, 62 (Del. Ch. 2007) ("The more logical explanation for why no bidder ever emerged is self-evident: MONY was not worth more than $31 per share."). The more logical explanation on the facts of this case is that potential overbidders did not see a realistic path to success. To make it worthwhile to bid, a potential deal jumper must not only value the target company above the deal price, but also perceive a pathway to success that is "sufficiently realistic to warrant incurring the time and expense to become involved in a contested situation, as well as the potential damage to professional relationships and reputation from intervening and possibly being unsuccessful." *Dell Fair Value*, 2016 WL 3186538, at *39. The lack of a realistic path to success explains why a bidder "would choose not to intervene in a go-shop, even if it meant theoretically leaving money on the table by allowing the initial bidder to secure an asset at a beneficial price." *Id.*

In this case, the most persuasive explanation is that the existence of an incumbent trade bidder holding an unlimited match right was a sufficient deterrent to prevent other

parties from perceiving a realistic path to success.[28] Put differently, for another bidder to warrant intervening, the bidder would have had to both (i) value the Company more highly than $33.25 per share *and* (ii) believe that it could outbid Fidelity, recognizing that Fidelity could achieve synergies from acquiring the Company and therefore would be likely to be able to outbid any competitor that lacked similar access to synergies or a comparable source of private value. Without the second half of the equation, an overbidder could force Fidelity to pay more, but it could not ultimately prevail. Without a realistic path to success, it made no sense to get involved.

At first blush, Altisource's decision not to bid during the go-shop phase appears to suggest that the Initial Merger Consideration exceeded fair value. Altisource was a trade bidder and therefore might have been expected to generate synergies from a transaction

---

[28] A matching right is the functional equivalent of a right of first refusal and can foreclose a topping bidder from having a realistic path to success. *See Bulletproof*, *supra*, at 870 ("The presence of rights of first refusal can be a strong deterrent against subsequent bids. . . . Success under these circumstances may involve paying too much and suffering the 'winner's curse.'"); *see also* Frank Aquila & Melissa Sawyer, *Diary Of A Wary Market: 2010 In Review And What To Expect In 2011*, 14 M & A Law. Nov.-Dec. 2010, at 1 ("Match rights can result in the first bidder 'nickel bidding' to match an interloper's offer, with repetitive rounds of incremental increases in the offer price. . . . Few go-shops are successful as it is . . . and match rights are just one more factor that may dissuade a potential competing bidder from stepping in the middle of an already-announced transaction."); Marcel Kahan & Rangarajan K. Sundaram, *First-Purchase Rights: Rights of First Refusal and Rights of First Offer*, 14 Am. L. & Econ. Rev. 331, 331 (2012) (finding "that a right of first refusal transfers value from other buyers to the right-holder, but may also force the seller to make suboptimal offers"); David I. Walker, *Rethinking Rights of First Refusal*, 5 Stan. J.L. Bus. & Fin. 1, 20-21 (1999) (discussing how a right of first refusal affects bidders); *cf.* Steven J. Brams & Joshua R. Mitts, *Mechanism Design in M&A Auctions*, 38 Del. J. Corp. L. 873, 879 (2014) ("The potential for a bidding war remains unless interlopers are restricted-say, to one topping bid, which then can be matched.").

with the Company. If so, and if the Initial Merger Consideration was equivalent to or less than fair value, than Altisource could have contested Fidelity's position. But there is also evidence in this case that because Altisource competed with some of the Company's clients, Altisource actually faced revenue dis-synergies as part of a potential deal, and that those dis-synergies would outweigh any cost savings that Altisource might achieve.

On the facts presented, the probative value of the go-shop is inconclusive. The same is true for the post-signing period between the end of the go-shop and the stockholder vote. During that nearly six-month period, the Company could no longer solicit additional bids, and the termination fee doubled from $37 million to $74 million, but otherwise the Company could entertain a bid that qualified as a Superior Proposal. Just as during the go-shop period, however, a topping bidder needed a realistic path to success to make it rational to intervene. The marginally greater impediments to a topping bid made that path less realistic, rather than more realistic, than during the post-go-shop phase.

### b.      Post-Closing Performance And The Operation Of The Collar

Immediately after the announcement of the Merger, Fidelity's stock price rose. It continued to rise during the post-signing period. Due to the collar, these increases caused the value of the merger consideration to increase. Fidelity twice exercised its right to increase the cash component, resulting in the Final Merger Consideration of $37.04 per share.

During the same time period that Fidelity's stock price was going up, the Company's financial performance was going down. In October 2013, the Company announced that quarter over quarter, revenue had declined by 10.6% and EBITDA by

18.4%. Compared to the Updated Base Case's projections for FY 2013, actual revenues were down 7.8% and EBITDA was down 16.2%.

The petitioners might have sought to address these issues. They might have attempted to show by reference to other companies or indices that but for the Merger, the Company's stock price would have risen as well, perhaps even more than Fidelity's. Or they might have sought to show that the declines in the Company's performance resulted from the Merger itself and therefore should be excluded as a valuation consideration, perhaps because the sale process diverted management's attention and harmed employee morale. They petitioners did not advance these or other arguments, which they would have had to support with persuasive evidence. The record rather indicates that Fidelity's performance improved, causing an increase in the value of the merger consideration, while the Company's performance declined.

Instead, the petitioners argued the declines in the Company's performance post-closing did not require any adjustments to the Updated Base Case and that management reaffirmed the Company's belief in the reliability of its projections. Accepting that as true, it suggests that the going concern value of the Company did not change such that the Initial Merger Consideration remained a reliable indicator of fair value and the Final Merger Consideration established a ceiling for fair value. *See Union Ill.*, 847 A.2d at 343 (relying on merger price in appraisal case despite six-month lag between signing and closing because "nothing occurred between the signing of the Merger Agreement and the effective date of the Merger that resulted in an increase in the value of UFG").

57

A final factor pertinent to the Company's post-signing, pre-closing performance is the extensive evidence indicating that the Initial Merger Consideration included a portion of the value that Fidelity and THL expected to generate from synergies. The Final Merger Consideration logically incorporated an additional portion of this value because of the component consisting of Fidelity stock, which drew some (admittedly unquantified) portion of its value from the synergies that Fidelity and its stockholders would enjoy. The existence of combinatorial synergies provides an additional reason to think that the Final Merger Consideration exceeded the fair value of the Company.

## B.    The DCF Analysis As Evidence Of Fair Value

Both the petitioners and the Company submitted valuation opinions from distinguished experts. The petitioners' expert, Professor Jerry A. Hausman, used a DCF analysis to opine that the Company's fair value at closing was $50.46 per share. The respondent's expert, Daniel Fischel, used a DCF analysis to opine that the Company's fair value at closing was $33.57 per share. The Final Merger Consideration was $37.14 per share.

"[T]he DCF . . . methodology has featured prominently in this Court because it is the approach that merits the greatest confidence within the financial community." *Owen v. Cannon*, 2015 WL 3819204, at *16 (Del. Ch. June 17, 2015) (quotation marks omitted).

> Put in very simple terms, the basic DCF method involves several discrete steps. First, one estimates the values of future cash flows for a discrete period . . . . Then, the value of the entity attributable to cash flows expected after the end of the discrete period must be estimated to produce a so-called terminal value, preferably using a perpetual growth model. Finally, the value of the cash flows for the discrete period and the terminal value must be discounted back . . . .

58

*Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *9 (Del. Ch. Aug. 19, 2005) (Strine, V.C.) (footnote omitted). This decision does not exhaustively describe the DCF methodology; it only addresses the areas of substantial disagreement between the experts.

### 1. The Projection Period

The first issue for any DCF analysis is to determine the appropriate forecasts to use for the projection period. Both experts used the Updated Base Case with minor adjustments. Hausman added back deferred income taxes and subtracted accounts payable, accrued liabilities, and other liabilities for 2014. JX 297 ¶ 67. Fischel added back deferred tax income and other investments. JX 296, Ex. 23. Neither provided a detailed explanation for their adjustments. This decision adopts the Updated Base Case and averages the adjustments that the experts made.

### 2. The Terminal Period

The next challenge for a DCF analysis is to extend the forecasts beyond the projection period to derive an estimate of cash flows during the terminal period. The experts disagreed on two aspects of the calculation.

The experts disagreed initially over the level of capital expenditures needed to sustain the Company's business during the terminal period. Over the long run, capital expenditures should equal depreciation. Robert W. Holthausen & Mark E. Zmijewski, *Corporation Valuation Theory, Evidence & Practice* 232 (2014). In the last year of the projection period, however, the Updated Base Case contemplated an amount for depreciation that exceeded capital expenditures. To bring the two into harmony, Hausman assumed that capital expenditures would exceed depreciation over time by an amount

59

sufficient to cause net amortizable assets to grow at the Company's long-term growth rate. Fischel chose to increase capital expenditures to equal depreciation. The record shows that the Company historically had high levels of depreciation relative to capital expenditures, so it is more reasonable to assume depreciation would decrease during the terminal period to match capital expenditures. This decision adopts that approach.

The experts also disagreed over the perpetuity growth rate. Hausman used 3.4%, which he derived from the projected rate of loan originations. Fischel used 2.2%, equal to the long-term rate of inflation.

"This Court often selects a perpetuity growth rate based on a reasonable premium to inflation." *DFC Glob.*, 2016 WL 3753123, at *17. This is because "[i]n a steady state, it is typically assumed that future business growth will approximate that of the overall economy." *In re Trados S'holder Litig.*, 73 A.3d 17, 73 (Del. Ch. 2013). "[O]nce an industry has matured, a company will grow at a steady rate that is roughly equal to the rate of nominal GDP growth." *Golden Telecom I*, 993 A.2d at 511. The risk-free rate is a viable proxy for expected nominal GDP growth. *See DFC Glob.*, 2016 WL 3753123, at *17.

The Company was a mature firm, so ordinarily it would grow at a rate approximating GDP growth. The Company's operative reality on the closing date, however, included the Services business, which had declining prospects, and a smaller Analytics business, which was growing. Given this business mix, the Company should grow over the long-term at a rate between inflation and nominal GDP that is closer to the latter. Hausman's rate of 3.4% better fits the operative reality of the Company, so this decision adopts his figure.

### 3. The Discount Rate

The final issue is the appropriate discount rate, which the experts derived by calculating the Company's weighted average cost of capital ("WACC"). They disagreed on virtually every input except the appropriate tax rate, where they both used 37%.

Hausman used a capital structure consisting of 81.1% equity, relying on the Company's financial statements from 2013 and the equity value implied by his DCF analysis. Fischel used a capital structure consisting of 70% equity, relying on the Company's pre-announcement debt-to-equity ratio. This decision adopts Fischel's approach, which is consistent with precedent and avoids the circularity in Hausman's method.

Hausman opined that the Company's cost of debt was 5.0% without citing any support. Fischel used a cost of debt of 5.02%, explaining that the Company's was rated BB+ from 2008 through 2014 and that the yield to maturity of a BB-rated bond index as of January 2, 2014 was 5.02%. Fischel provided a better justification for his number, so this decision uses it.

The experts disagreed about the risk-free rate. Hausman used 3.63%, which was the return on a 20-year U.S. Treasury bond as of December 2013. Fischel used 3.68%, which was the return on a 20-year U.S. Treasury bond as of January 2, 2014. Fischel's measurement was closer to the closing date, so this decision adopts it.

Both experts used the supply-side equity risk premium. Hausman used 6.11%, which he obtained from Ibbotson's 2013 Valuation Yearbook. Fischel used 6.18%, which he obtained from the 2014 Duff & Phelps Valuation Handbook. Fischel's figure better

captures the Company's operative reality on the closing date. *See Ancestry.com*, 2015 WL 399726, at *21 (rejecting argument that court should have used 2012 Ibbotson Yearbook instead of 2013 Yearbook for merger that closed on December 28, 2012, because the 2013 Yearbook would not have been available to investors yet when the merger closed).

The experts chiefly disagreed over beta. Hausman derived a beta of 0.845 from five years of daily observations. Fischel used a beta of 1.395, which represented the average of (i) a beta derived from five years of monthly observations and (ii) a beta derived from two years of weekly observations. The beta drives the bulk of the valuation difference between the experts. Inserting Hausman's beta into Fischel's model generates a value of $51.18 per share.

"Beta, like cost of capital itself, is a forward-looking concept. It is intended to be a measure of the *expected* future relationship between the return on an individual security (or portfolio of securities) and the overall market." Duff & Phelps, *2015 Valuation Handbook: Guide to Costs of Capital* 5-3 (2015). The Company's performance during the measuring period therefore should match, to the extent possible, the anticipated performance of the Company going forward. The financial literature indicates that using a five-year measurement period is both acceptable and common, but that a shorter period should be used if a five-year look back encompasses significant changes in the

macroeconomic environment[29] or the company's business.[30] In this case, five years covers the Great Recession and attendant housing crisis, which benefitted the Company and caused it to outperform the S&P 500. Company management and BCG anticipated that the Company would perform going forward at substantially lower levels. Looking back five years also covers a period when the Company was more dependent on Services, while going forward the Company will rely more on Analytics. These factors counsel in favor of

---

[29] Duff & Phelps, 2015 Valuation Handbook, *supra*, at 5-7 ("If a fundamental change in the business environment in which an individual company (or even an industry) operates occurs, the valuation analyst should consider whether using historical data from *before* the change should be included in the overall [beta] analysis."). As an example, the Duff and Phelps 2015 Valuation Handbook cites the effect of the Great Recession on the financial sector, suggesting it would not be appropriate for an analyst to include pre-crisis data. *Id.*

[30] Holthausen & Zmijewski, *supra*, at 300 ("Using more recent data might better reflect a company's current (and more forward-looking) systematic risk. Betas can shift because of changes in capital structure or because of changes in the underlying business risk of the company, or because of fundamental changes in the market. . . ."); Tim Koller, Marc Goedhart & David Wessels, *Valuation: Measuring and Managing the Value of Companies* 247 (5th ed. 2010) (advocating for five-year monthly but noting that "changes in corporate strategy or capital structure often lead to changes in risk for stockholders. In this case, a long estimation period would place too much weight on irrelevant data"); Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital: Applications and Examples* 208 (5th ed. 2014) ("Most services that calculate beta use a two- or five-year sample measurement or look-back period. Five years is the most common . . . But if the business characteristics change during the sampling period . . . , it may be more appropriate to use a shorter sampling period. However, as the sampling period used is reduced, the accuracy of the estimate is generally reduced."); *see DFC Glob.*, 2016 WL 3753123, at *10 n.124 ("[L]ong estimation period may be inappropriate when analysis of the five-year historical chart shows changes in corporate strategy or capital structure that could render prior data irrelevant." (citing Koller, Goedhart & Wessels, *supra*, at 247)); *see also* James R. Hitchner, *Financial Valuation: Applications and Models* 256 (3d ed. 2011) (noting that in measuring closely-held companies, sources "use anywhere from a two- to five-year period to measure beta, with the five-year period being the most common").

using a two-year period as a better predictor of the Company's operative reality at the time of the Merger.

Discarding the five-year betas leaves Fischel's measurement of 1.503, which relied on weekly observations. The financial literature supports using a two-year beta with weekly observations, so this decision could adopt this estimate.[31] Fischel, however, used a lower beta of 1.395. By doing so, Fischel favored the petitioners. That fact enhances the credibility of his selection, so this decision uses his figure.

The last input is the size premium. Hausman added a size premium of 0.92%. Fischel did not add a size premium, arguing that there "is no consensus in the academic literature as to whether such a premium still exists." JX 296 ¶ 113 n.163. Adding a size premium increases the discount rate and lowers the value of the Company. As with his estimate of beta, Fischel's judgment favored the petitioners, so this decision uses it.

These inputs result in a WACC of 9.56%, which this decision adopts. Adding a size premium of 0.92% to the cost of equity would increase the WACC to 10.2%.

---

[31]John Y. Campbell, Andrew W. Lo & A. Craig Mackinlay, *The Econometrics of Financial Markets* 184 (1997); Holthausen & Zmijewski, *supra*, at 301 (noting that Bloomberg's default is to use "104 weeks of weekly observations or two years of data"); *id.* at 300 ("The most commonly used intervals for estimating betas are monthly, weekly, and, to a lesser extent, daily returns. The precision of regression parameters tends to increase with more observations; hence, all else equal, we prefer to use more observations."); *id.* at 302 ("When using daily beta, a common rule of thumb is to use one to two years of data . . . . When using weekly data, it is a fairly common practice to use two years of data . . . . ); *see also* Hitchner, *supra*, at 256 (noting that in valuing closely-held companies, "the frequency of the data measurements varies, with monthly data being the most common, although some sources use weekly data").

### 4. The DCF Valuation

A DCF valuation using the foregoing inputs produces a value of $38.67 per share, which is 4% higher than the Final Merger Consideration of $37.14 per share. Using a WACC of 10.02% would produce a value of $34.50 per share, or 8% less than the Final Merger Consideration. These figures bracket what the stockholders received. Nevertheless, the figure of $38.67 per share is my best estimate of the fair value of the Company based on the DCF method.

## B. The Weight Given To The Methodologies

When presented with multiple indicators of fair value, the court must determine how to weigh them. "In discharging its statutory mandate, the Court of Chancery has discretion to select one of the parties' valuation models as its general framework or to fashion its own." *M.G. Bancorporation*, 737 A.2d at 525-26. "The Court may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to the resulting valuation."[32] The court also may "make its own independent valuation calculation by either adapting or blending the factual assumptions of the parties' experts." *M.G. Bancorporation*, 737 A.2d at 524. "When . . . none of the

---

[32] Appraisal Rights, *supra*, at A-31 (citing ONTI, 751 A.2d at 907) (basing fair value calculation on one expert's valuation, "modifying it where appropriate by the primary adjustment claims asserted by [the company]"); *Kleinwort Benson Ltd. v. Silgan Corp.*, 1995 WL 376911, at *5 (Del. Ch. June 15, 1995) ("I will not construct my own DCF model. From the evidence presented by [the] experts, I will choose the DCF analysis that best represents Silgan's value. Next, . . . I will scrutinize that DCF analysis to remove the adversarial hyperbole that inevitably influences an expert's opinion in valuation proceedings." (citation omitted))).

parties establishes a valuation that is persuasive, the Court must make a determination based on its own analysis."[33]

Delaware law does not have a rigid hierarchy of valuation methodologies, nor does it have a settled formula for weighting them. "Appraisal is, by design, a flexible process." *Golden Telecom II*, 11 A.3d at 218. The statute "vests the Chancellor and Vice Chancellors with significant discretion to consider 'all relevant factors' and determine the going concern value of the underlying company." *Id.* (quoting 8 *Del. C.* § 262(h)).

In a series of decisions since *Golden Telecom II*, this court has considered how much weight to give the deal price relative to other indications of fair value. In five decisions since *Golden Telecom II*, the Court of Chancery has given exclusive weight to the deal price, particularly where other evidence of fair value was unreliable or weak. In five other decisions since *Golden Telecom II*, the court has declined to give exclusive weight to the deal price in situations where the respondent failed to overcome the petitioner's attacks on the sale process and thus did not prove that it was a reliable indicator of fair value.

*CKx* was the first post-*Golden Telecom II* decision to rely exclusively on the merger price. The court found that "[t]he company was sold after a full market canvass and auction," the process was "free of fiduciary and process irregularities," and "the sales price

---

[33]*Pabst Brewing Co.*, 1993 WL 208763, at *8; *accord Del. Open MRI Radiology Assocs.*, 898 A.2d at 310-11 ("I cannot shirk my duty to arrive at my own independent determination of value, regardless of whether the competing experts have provided widely divergent estimates of value, while supposedly using the same well-established principles of corporate finance.").

[was] a reliable indicator of value." 2013 WL 5878807 at *1. By contrast, the parties' experts in *CKx* did not establish the reliability of their methods. The court found that (i) the company lacked sufficiently comparable peers and (ii) that "the evidence [was] overwhelming" that a key element of management's projections "was not prepared in the ordinary course of business" and "was otherwise unreliable." *Id.* at *10. "In the absence of comparable companies or transactions to guide a comparable companies analysis or a comparable transactions analysis, and without reliable projections to discount in a DCF analysis," the court relied "on the merger price as the best and most reliable indication of [the company's] value." *Id.* at *11. The court stressed that the "conclusion that merger price must be the primary factor in determining fair value is justified in light of the absence of any other reliable valuation analysis." *Id.* at *13.

In *Ancestry.com*, the court again relied exclusively on the merger price. The court found that the company was sold after an "auction process" which involved "a market canvass and uncovered a motivated buyer. 2015 WL 399726, at *1. The court concluded that the sale process "represent[ed] an auction of the Company that is unlikely to have left significant stockholder value unaccounted for." *Id.* at *16. As in *CKx*, there were "no comparable companies to use for purposes of valuation." *Id.* at *18. The court also had "reason to question management[']s] projections, which were done in light of the transaction and in the context of obtaining a fairness opinion," and where "management did not create projections in the normal course of business." *Id.* at *18. The court prepared its own DCF analysis, which it regarded as a reliable indicator of value, but the answer was reasonably close to the deal price. That outcome gave the court "comfort that no undetected

67

factor skewed the sales process." *Id.* at *23. The court found that "fair value in these circumstances [was] best represented by the market price." *Id.*

In *AutoInfo*, the court again relied exclusively on the merger price. The company conducted an extensive sale process in which its financial advisor contacted 165 potential strategic and financial acquirers, seventy signed NDAs, ten submitted indications of interest after conducting due diligence, nine received management presentations, five submitted verbal valuations or written letters of intent, and the company ultimately negotiated exclusively with the highest bidder. 2015 WL 2069417, at *3-6. The court concluded that "evidence regarding AutoInfo's sales process substantiates the reliability of the Merger price." *Id.* at *11. The court later reiterated that "the sales process was generally strong and can be expected to have led to a Merger price indicative of fair value." *Id.* at *14. The expert's valuation methodologies lacked similar persuasiveness. Management had prepared projections as part of the sale process, but management had never prepared projections before, and the court found them unreliable. *Id.* at *8. The court also found that there were no comparable companies that could be used for valuation purposes. *Id.* The court rejected both sides' valuation analyses as unreliable, but as in *Ancestry*, prepared its own DCF analysis. *Id.* at *16. Despite noting that the "[u]nder Delaware law, it would be appropriate to provide weight to the value as implied by the Court's DCF analysis," the decision elected to put "full weight" on the deal price as "the best estimate of value." *Id.*

In *Ramtron*, the court once again relied exclusively on the merger price. The company conducted a "thorough" sale process in response to an unsolicited tender offer. 2015 WL 4540443, at *1. The company rejected the hostile bid on multiple occasions and

"actively solicited every buyer it believed could be interested in a transaction." *Id.* at *21. The company ultimately agreed to a transaction with the unsolicited bidder only after extracting five separate price increases. *Id.* at *24. As in *CKx*, management's projections were "not reliable," and the parties' experts agreed that there were "no comparable companies." *Id.* at *1, *18.

In *BMC*, the court relied exclusively on the merger price yet again. The company engaged in "a thorough and vigorous sales process" that involved outreach to financial and strategic buyers. 2015 WL 6164771, at *1. The court found that the merger price was "sufficiently structured to develop fair value" and hence a reliable indicator of value. *Id.* at *16. The court also constructed a DCF analysis based on a set of management projections, which the court believed represented "the best DCF valuation based on the information available to me." *Id.* at *18. The court nevertheless declined to give weight to the DCF valuation, reasoning as follows:

> My DCF valuation is a product of a set of management projections, projections that in one sense may be particularly reliable due to BMC's subscription-based business. Nevertheless, the Respondent's expert, pertinently, demonstrated that the projections were historically problematic, in a way that could distort value. The record does not suggest a reliable method to adjust these projections. I am also concerned about the discount rate in light of a meaningful debate on the issue of using a supply side versus historical equity risk premium. Further, I do not have complete confidence in the reliability of taking the midpoint between inflation and GDP as the Company's expected growth rate.
>
> Taking these uncertainties in the DCF analysis—in light of the wildly-divergent DCF valuation of the experts—together with my review of the record as it pertains to the sales process that generated the Merger, I find the merger price . . . to be the best indicator of fair value. . . .

*Id.* at *18.

In five other decisions since *Golden Telecom II*, the Court of Chancery has considered the deal price, but has either not relied on it or given it limited weight. In *Orchard Enterprises*, the court declined to give weight to the merger price in an appraisal proceeding that followed a merger between a corporation and an affiliate of a large stockholder, observing that "the trial did not focus extensively on the quality of marketing . . . or the utility of the 'go shop' provision in the merger agreement, which could obviously have been affected by [a large stockholder's] voting power and expressed interest to acquire all of [the company] for itself." 2012 WL 2923305, at \*5. Similarly in *3M Cogent*, the court gave no weight to a deal price of $10.50 per share where the respondent corporation did not seek to have the court award that amount as fair value and relied instead on its experts' opinions that proposed a fair value award of $10.12 per share. *Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at \*5 (Del. Ch. July 8, 2013). The court also noted that the respondent corporation and its experts had not made any attempt to adjust the merger price for synergies or similar elements of value that arose from the merger.[34]

---

[34] *Id.* If the respondent corporation had relied affirmatively on the deal price and made some attempt to deal with synergies, it seems likely that the court would have given the deal price at least some weight. The transaction resulted from a process that involved a pre-signing outreach to twenty-five potential strategic and financial partners, followed by competition among four strategic bidders to acquire the company. *See id.* at \*2-3. Using a DCF analysis, the court ultimately determined that the fair value of the company as $10.87 per share, just above the deal price. *Id.* at \*26. If the respondent had made a different tactical decision, the *3M Cogent* court could well have relied on the deal price.

In *Dell*, I gave limited weight to the deal price, finding that the respondent corporation "did not establish that the outcome of the sale process offer[ed] the most reliable evidence of the Company's value as a going concern." *Dell Fair Value*, 2016 WL 3186538, at *44. I nevertheless found that the market data was sufficient

> to exclude the possibility, advocated by the petitioners' expert, that the Merger undervalued the Company by $23 billion. Had a value disparity of that magnitude existed, then [a strategic bidder] would have emerged to acquire the Company on the cheap. What the market data [did] not exclude is an underpricing of a smaller magnitude.

*Id.* A confluence of multiple factors caused me not to give greater weight to the deal price, including (i) the transaction was an MBO, (ii) the bidders used an LBO pricing model to determine the original merger consideration, (iii) there was compelling evidence of a significant valuation gap driven by the market's short-term focus, and (iv) the transaction was not subjected to meaningful pre-signing competition. *See id.* at *29-37. Although the deal price increased as a result of post-signing developments, the pattern of bidding by financial sponsors during the go-shop reinforced the conclusion that the consideration did not represent fair value, and the petitioners proved that there were structural impediments to a topping bid on the facts of the case, particularly in light of the size and complexity of the company and the sell-side involvement of the company's founder. *See id.* at *37-44. I relied instead on a DCF analysis to determine fair value. *Id.* at *51.

More recently, in *DFC Global*, the court gave equal weight to the deal price, the court's DCF valuation, and one of the expert's comparable companies analysis. 2016 WL 3753123, at *23. The court found that the merger giving rise to the appraisal proceeding had been "negotiated and consummated during a period of significant company turmoil

71

and regulatory uncertainty, calling into question the reliability of the transaction price as well as management's financial projections." *Id.* at *1. The company's competitors faced similar challenges, and the resulting uncertainty undermined the projections. *Id.* at *22. It also meant that the company was sold during a valuation trough, which suggested that "the transaction price would not necessarily be a reliable indicator." *Id.* The court also noted that the financial sponsor who acquired the company had focused "on achieving a certain internal rate of return and on reaching a deal within its financing constraints," which could generate an outcome different from fair value. *Id.* To a lesser degree, the uncertainly also undermined the multiples-based valuation, because that valuation relied on two years of management projections. The court concluded that "all three metrics suffer from various limitations but . . . each of them still provides meaningful insight into [the company's] value." *Id.* at *23. The court also observed that "all three of them fall within a reasonable range." *Id.* The court therefore elected to weight them equally.

Most recently, in *Dunmire v. Farmers & Merchants Bancorp of Western Pennsylvania, Inc.*, 2016 WL 6651411 (Del. Ch. Nov. 10, 2016), the court declined to rely on the deal price where a controlling stockholder set the exchange ratio for a stock-for-stock transaction between the company and another entity controlled by the same family. The decision noted that (i) "the Merger was not the product of an auction," (ii) no third parties were solicited, (iii) a controlling stockholder stood on both sides of the deal, (iv) although a special committee negotiated with the controller, the record did "not inspire confidence that the negotiations were truly arms-length," and (v) the transaction was not

conditioned on a majority-of-the minority vote. *Id.* at *7-8. The only surprising aspect of *Dunmire* is the respondent argued in favor of deference to the deal price.

This case is most similar to *AutoInfo* and *BMC*. The Company ran a sale process that generated reliable evidence of fair value. The Company also created a reliable set of projections that support a meaningful DCF analysis. Small changes in the assumptions that drive the DCF analysis, however, generate a range of prices that starts below the merger price and extends far above it. My best effort to resolve the differences between the experts resulted in a DCF valuation that is within 3% of the Final Merger Consideration. The proximity between that outcome and the result of the sale process is comforting. *See S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007, at *19 (Del. Ch. Mar. 9, 2011) ("[W]hat you actually like to see when you're doing a valuation is some type of overlap between the various methodologies." (quotation marks omitted)), *aff'd*, 35 A.3d 419 (Del. 2011) (TABLE).

As noted, a DCF analysis depends heavily on assumptions. Under the circumstances, as in *AutoInfo* and *BMC*, I give 100% weight to the transaction price.

## C. Whether To Make An Adjustment For Combinatorial Synergies

The Company argued belatedly that the court should make a finding regarding the value of the combinatorial synergies and deduct some portion of that value from the deal price to generate fair value. That is a viable method. *See*, *e.g., Union Ill.*, 847 A.2d at 353 n.26; *Highfields*, 939 A.2d at 61. In this case, however, the Company litigated on the theory that the Final Merger Consideration represented the "maximum fair value" of the shares. JX 296 ¶ 128. In his expert report, Fischel declined to offer any opinion on the quantum of

synergies or to propose an adjustment to the merger price. *Id.* At trial, Fischel affirmed that he did not have any basis to opine regarding a specific quantum of synergies. Tr. 982 (Fischel). Having taken these positions, it was too late for the Company to argue in its post-trial briefs that the court should deduct synergies.

## III. CONCLUSION

The fair value of the Company on the closing date was $37.14 per share. The legal rate of interest, compounded quarterly, shall accrue on this amount from the date of closing until the date of payment. The parties shall cooperate on preparing a final order. If there are additional issues that need to be resolved before a final order can be entered, the parties shall submit a joint letter within two weeks that identifies them and recommends a schedule for bringing this matter to a conclusion, at least at the trial court level.